UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VIACOM INTERNATIONAL INC., MTV NETWORKS, a division of Viacom International Inc., COMEDY PARTNERS, BET HOLDINGS LLC, and COUNTRY MUSIC TELEVISION, INC., <br><br>          Plaintiffs and <br>          Counterclaim-Defendants, <br><br> v. <br><br> TIME WARNER CABLE INC., TIME WARNER ENTERTAINMENT COMPANY L.P., and TIME WARNER CABLE LLC, <br><br>          Defendants and <br>          Counterclaim-Plaintiffs. | ECF CASE <br><br> Civil Action No. 11-cv-2387 (LBS) <br><br><br> **AMENDED ANSWER AND COUNTERCLAIMS** |

## AMENDED ANSWER

Defendants Time Warner Cable Inc. ("TWC"), Time Warner Entertainment Company L.P., and Time Warner Cable LLC (together the "Defendants"), by and through their undersigned attorneys, submit the following Answer to the Complaint of Plaintiffs Viacom International Inc. ("Viacom"), MTV Networks ("MTVN"), a division of Viacom International Inc., Comedy Partners, BET Holdings LLC ("BET"), and Country Music Television, Inc. ("CMT") (together, the "Plaintiffs").

### NATURE OF THE ACTION

1.     Defendants admit that Plaintiffs purport to bring this action for damages and to enjoin Defendants from distributing certain programming offered by certain of the Plaintiffs. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second sentence of Paragraph No. 1 of the Complaint. Defendants deny the remaining allegations in Paragraph No. 1 of the Complaint.

2.    Defendants admit that Plaintiffs' Complaint asserts various causes of action and purports to seek injunctive relief, damages and declaratory relief. Defendants deny the remaining allegations in Paragraph No. 2 of the Complaint.

3.    Defendants admit that, on March 15, 2011, TWC launched its TWCable TV iPad App, through which TWC makes certain cable programming viewable by its video subscribers on Apple iPad tablet computers within the subscribers' homes ("in-home iPad viewing"); that TWC distributed certain programming for in-home iPad viewing, including programming provided by certain of the Plaintiffs; that, on or around March 15, 2011, TWC temporarily halted distribution of certain programming for in-home iPad viewing, including programming provided by certain of the Plaintiffs; and that, on or around March 31, 2011, TWC ceased distributing certain of the Plaintiffs' programming for in-home iPad viewing. Defendants deny the remaining allegations in Paragraph No. 3 of the Complaint.

4.    Defendants admit that Plaintiffs purport to bring this action for a declaratory judgment, damages and to enjoin Defendants from distributing certain programming. Defendants deny that any of the Defendants infringed any of the Plaintiffs' copyrights or trademarks, or breached any agreements with Plaintiffs, and deny that Plaintiffs are entitled to injunctive relief, declaratory relief, damages, or any other relief of any kind. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the remainder of Paragraph No. 4 of the Complaint and, therefore, deny the same.

5.    Defendants admit that certain of the Defendants are parties to agreements with certain of the Plaintiffs (collectively, and together with the amendments thereto, the "Viacom Affiliation Agreements"), and refer to those agreements for the terms thereof, which agreements grant to TWC, *inter alia*, a broad right of carriage to distribute programming of certain networks

2

owned by Viacom and its affiliates (together, the "Viacom Services"), to TWC video subscribers utilizing TWC's cable system; that TWC or its affiliates provide video, high-speed data, and voice services for which subscribers generally pay monthly fees; and that from March 15, 2011 through and including March 31, 2011, TWC made certain of the Viacom Services available for in-home iPad viewing to certain TWC video subscribers. Defendants deny the remaining allegations in Paragraph No. 5 of the Complaint.

6.    Defendants admit that certain of the Defendants are parties to the Viacom Affiliation Agreements, which agreements grant to TWC, *inter alia*, a broad right of carriage to distribute the Viacom Services to TWC video subscribers utilizing TWC's cable system, and refer to those agreements for the contents thereof. Defendants deny the remaining allegations in Paragraph No. 6 of the Complaint.

7.    Defendants admit that beginning in December 2010, certain of the Plaintiffs objected to in-home iPad viewing and that representatives of certain of the Defendants and certain of the Plaintiffs had discussions and exchanged correspondence in that regard. Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the first sentence, and otherwise deny the remainder of, Paragraph No. 7 of the Complaint.

8.    Defendants admit that, on March 15, 2011, TWC made in-home iPad viewing available to its video subscribers and that the launch was accompanied by announcements regarding in-home iPad viewing. Defendants deny the remaining allegations in Paragraph No. 8 of the Complaint.

9.    Defendants admit they contend that the in-home iPad viewing offered to their video subscribers is authorized under the Viacom Affiliation Agreements. Defendants also admit that in-home iPad viewing does not presently support emergency alert features, but deny that this

gives rise to any cognizable claim by Plaintiffs.  Defendants deny the remaining allegations in Paragraph No. 9 of the Complaint.

10.    Defendants deny the allegations in Paragraph No. 10 of the Complaint.

11.    Defendants admit that Plaintiffs' Complaint purports to seek injunctive relief and damages.  Defendants deny the remaining allegations in Paragraph No. 11 of the Complaint.

## JURISDICTION AND VENUE

12.    Defendants admit that pursuant to 28 U.S.C. § 1331, district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States" and that pursuant to 28 U.S.C. § 1338(a), district courts have exclusive jurisdiction over "any civil action arising under any Act of Congress relating to . . . copyrights," but deny the remaining allegations in Paragraph No. 12 of the Complaint and further deny that Plaintiffs have any valid claims arising under the Copyright Act.

13.    Defendants admit the allegations in Paragraph No. 13 of the Complaint, but deny that Plaintiffs have any valid claims arising under the Lanham Act.

14.    Defendants deny that Plaintiffs have any valid claims arising under the Copyright Act or the Lanham Act, and therefore deny the allegations in Paragraph No. 14.

15.    Defendants admit the allegations in the first three sentences of Paragraph No. 15 of the Complaint and further admit that Viacom International Inc. and Comedy Partners have their respective principal places of business in New York and in this District.  Defendants deny the remaining allegations in Paragraph No. 15 of the Complaint.

16.    Defendants admit the allegations in Paragraph No. 16 of the Complaint.

## THE PARTIES

17.    Defendants admit that Viacom International Inc. is a Delaware corporation with its principal place of business in New York, New York, but lack knowledge or information

4

sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 17 of the Complaint and, therefore, deny the same.

18. Defendants admit the allegations in Paragraph No. 18 of the Complaint.

19. Defendants admit that Comedy Partners is a general partnership formed in New York with its principal place of business in New York, New York, but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 19 of the Complaint and, therefore, deny the same.

20. Defendants admit that BET Holdings LLC is an affiliate of Viacom Inc. and a successor in interest to Black Entertainment Television, Inc. and is a Delaware limited liability company, but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in Paragraph No. 20 of the Complaint and, therefore, deny the same.

21. Defendants admit that Country Music Television, Inc. is a Tennessee corporation, but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 21 of the Complaint and, therefore, deny the same.

22. Defendants admit the allegations in Paragraph No. 22 of the Complaint.

23. Defendants admit the allegations in Paragraph No. 23 of the Complaint.

24. Defendants admit the allegations in Paragraph No. 24 of the Complaint.

## FACTS

25. Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in Paragraph No. 25 of the Complaint and, therefore, deny the same.

26.     Defendants admit that networks owned or operated by Plaintiffs or their affiliates include *MTV, MTV2, mtvU, MTV Tr3s, VH1, VH1 Classic, CMT, Logo, Nickelodeon/Nick at Nite, Nick Jr., Teen Nick, Nicktoons Networks, BET, Comedy Central, Spike TV,* and *TV Land,* but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 26 of the Complaint and, therefore, deny the same.

27.     Defendants admit that certain of the Plaintiffs make their programming available on cable systems, on satellite television systems, over the public Internet, and by other methods, but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 27 of the Complaint and, therefore, deny the same.

28.     Defendants admit that certain of the Plaintiffs make their programming available through certain other outlets, but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 28 of the Complaint and, therefore, deny the same.

29.     Defendants admit that certain of the Plaintiffs receive revenues from license fees and from commercial advertising, but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 29 of the Complaint and, therefore, deny the same.

30.     Defendants admit that the Nielsen Company or affiliates thereof provide viewership tracking information, obtained in part from electronic tracking devices, to certain programming networks, but lack knowledge or information sufficient to form a belief as to the

truth or accuracy of the allegations set forth in the remainder of Paragraph No. 30 of the Complaint and, therefore, deny the same.

31.     Defendants admit the allegations in the fourth sentence of Paragraph No. 31 and refer to the Nielsen 2010 Annual Report for a complete and accurate account of its contents. Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the remaining allegations set forth in Paragraph No. 31 of the Complaint and, therefore, deny the same.

32.     Defendants admit that some cable television advertising arrangements include guarantees to the advertiser, but lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 32 of the Complaint and, therefore, deny the same.

33.     Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in Paragraph No. 33 of the Complaint and, therefore, deny the same.

34.     Defendants admit that, as of the date hereof, the Nielsen Company and its affiliates have not yet publicly introduced automated electronic systems designed specifically to monitor in-home iPad viewing on TWC's cable systems, but, upon information and belief, state that Nielsen Company has such a system under development. Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 34 of the Complaint and, therefore, deny the same.

35.     Defendants admit that video, high-speed data, and voice services are three of the subscription services offered by TWC to its customers; that TWC's website and 2010 Annual Report discuss the provision of these services; and refer to the contents of such website and 2010

Annual Report, respectively, for a complete and accurate account of their contents. Defendants deny the remaining allegations in Paragraph No. 35 of the Complaint.

36.    Defendants admit that TWC's 2010 Annual Report states that "TWC has approximately 12.3 million residential video subscribers," that, among other things, "TWC's video subscribers pay a fixed monthly fee based on the video programming tier they receive," and otherwise refer to TWC's 2010 Annual Report for a complete and accurate account of its contents. Defendants deny the remaining allegations in Paragraph No. 36 of the Complaint.

37.    Defendants admit that TWC's 2010 Annual Report states that, "[a]s of December 31, 2010, TWC served approximately 9.5 million residential high-speed data subscribers;" that "[s]ubscribers pay a fixed monthly fee based on the level of service received," and refer to TWC's 2010 Annual Report for a complete and accurate account of its contents. Defendants deny the remaining allegations in Paragraph No. 37 of the Complaint.

38.    Defendants admit that certain of the Defendants are parties to the Viacom Affiliation Agreements; and refer to those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 38 of the Complaint.

39.    Defendants deny the allegations in Paragraph No. 39 of the Complaint.

40.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, including an agreement dated August 10, 2000, with MTV Networks, and refer to those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 40 of the Complaint.

41.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 41 of the Complaint.

42.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 42 of the Complaint.

43.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 43 of the Complaint.

44.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 44 of the Complaint.

45.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 45 of the Complaint.

46.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, including an agreement dated April 23, 2003, with MTV Networks and Comedy Partners, and refer to those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 46 of the Complaint.

47.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 47 of the Complaint.

48.    Defendants admit that certain of the Defendants entered the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 48 of the Complaint.

49.     Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 49 of the Complaint.

50.     Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, including agreements with CMT and with BET and/or affiliates or successors thereof that were subsequently amended; and lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the remainder of Paragraph No. 50 of the Complaint and, therefore, deny the same.

51.     Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 51 of the Complaint.

52.     Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 52 of the Complaint.

53.     Defendants admit that Plaintiffs use the term "Agreements" to refer collectively to certain agreements certain of the Defendants entered into with certain of the Plaintiffs and/or successors or affiliates thereof, but aver that certain of those agreements have subsequently been amended and therefore deny that the "Agreements" as defined in Paragraph 53 fully constitute the operative agreements between the parties. Defendants deny the remaining allegations in Paragraph No. 53 of the Complaint.

54.     Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements and amendments for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 54 of the Complaint.

55.     Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements and amendments for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 55 of the Complaint.

56.     Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 56 of the Complaint.

57.     Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements and amendments for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 57 of the Complaint.

58.     Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 58 of the Complaint.

59.     Defendants deny the allegations in Paragraph No. 59 of the Complaint.

60.     Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in Paragraph No. 60 of the Complaint and, therefore, deny the same.

61.     Defendants admit that Plaintiffs have attached to the Complaint a list of television programs in which certain of the Plaintiffs purport to own copyright interests, but lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the remainder of Paragraph No. 61 of the Complaint and, therefore, deny the same.

62.     Defendants aver that Paragraph No. 62 of the Complaint constitutes a legal conclusion to which no response is required, except admit that Plaintiffs have attached to the

Complaint copies of what Plaintiffs allege to be Certificates of Registration from the United States Copyright Office, in which certain of the Plaintiffs are identified as the author.

63.     Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in Paragraph No. 63 of the Complaint and, therefore, deny the same.

64.     Defendants deny the allegations in Paragraph No. 64 of the Complaint.

65.     Defendants deny the allegations in Paragraph No. 65 of the Complaint.

66.     Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in Paragraph No. 66 of the Complaint and, therefore, deny the same.

67.     Defendants admit that Plaintiffs have attached to the Complaint copies of what Plaintiffs allege to be service mark registrations from the United States Patent and Trademark Office, in which certain of the Plaintiffs are identified as the owner.  Defendants deny the remaining allegations in Paragraph No. 67 of the Complaint.

68.     Defendants aver that Paragraph No. 68 of the Complaint constitutes a legal conclusion to which no response is required, except admit that Plaintiffs have attached to the Complaint copies of what Plaintiffs allege to be service mark registrations from the United States Patent and Trademark Office, in which certain of the Plaintiffs are identified as the owner.

69.     Defendants deny the allegations in Paragraph No. 69 of the Complaint.

70.     Defendants admit that, on March 15, 2011, TWC made in-home iPad viewing, which included certain of the Viacom Services, available to certain video subscribers. Defendants deny the remaining allegations in Paragraph No. 70 of the Complaint.

71.    Defendants admit that, on March 15, 2011, TWC made in-home iPad viewing, which included certain of the Viacom Services, available to certain video subscribers and that certain of the Plaintiffs expressed objections thereto.  Defendants deny the remaining allegations in Paragraph No. 71 of the Complaint.

72.    Defendants admit that they make certain cable programming viewable by their video subscribers on Apple iPad tablet computers within the subscribers' homes.  Defendants otherwise deny the allegations in Paragraph No. 72 of the Complaint

73.    Defendants deny the allegations in Paragraph No. 73 of the Complaint.

74.    Defendants admit that, on March 15, 2011, counsel for certain of the Plaintiffs sent a letter to TWC, and refer to the contents of the letter; that, on March 15, 2011, TWC made in-home iPad viewing, which included certain of the Viacom Services, available to certain of its video subscribers; that, on or around March 15, 2011, TWC temporarily halted distribution of certain programming for in-home iPad viewing, including certain of the Viacom Services; and that, on or around March 31, 2011, TWC ceased distributing the Viacom Services for in-home iPad viewing.  Defendants deny the remaining allegations in Paragraph No. 74 of the Complaint.

75.    Defendants deny the allegations in Paragraph No. 75 of the Complaint.

76.    Defendants deny the allegations in Paragraph No. 76 of the Complaint.

77.    Defendants deny the allegations in Paragraph No. 77 of the Complaint.

78.    Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the first and third sentences of Paragraph No. 78 of the Complaint and, therefore, deny the same.  Defendants deny the remaining allegations in Paragraph No. 78 of the Complaint.

79.    Defendants deny the allegations in Paragraph No. 79 of the Complaint.

80.    Defendants deny the allegations in Paragraph No. 80 of the Complaint.

81.    Defendants admit that, as of the date hereof, the Nielsen Company and its affiliates have not yet publicly introduced automated electronic systems designed specifically to monitor in-home iPad viewing on TWC's cable systems, but, upon information and belief, state that Nielsen Company has such a system under development. Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the first sentence of Paragraph No. 81 of the Complaint and, therefore, deny the same. Defendants deny the remaining allegations in Paragraph No. 81 of the Complaint.

82.    Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the first and second sentences of Paragraph No. 82 of the Complaint and, therefore, deny the same. Defendants deny the remaining allegations in Paragraph No. 82 of the Complaint.

83.    Defendants lack knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations set forth in the first and second sentences of Paragraph No. 83 of the Complaint and, therefore, deny the same. Defendants deny the remaining allegations in Paragraph No. 83 of the Complaint.

84.    Defendants deny the allegations in Paragraph No. 84 of the Complaint.

## CLAIMS FOR RELIEF

## COUNT I

## (Declaratory Judgment)

85.    Defendants repeat and reallege each and every response to paragraphs 1 through 84 of the Complaint above as if fully set forth herein.

86.     Defendants admit that there is an actual case or controversy between certain of the Defendants and certain of the Plaintiffs arising out of the Viacom Affiliation Agreements. Defendants deny the remaining allegations in Paragraph No. 86 of the Complaint.

87.     Defendants deny the allegations in Paragraph No. 87 of the Complaint.

88.     Defendants admit that under the grant of rights in the Viacom Affiliation Agreements, Defendants are authorized to provide services to their video subscribers, including among other means through the TWCable TV iPad App, a "Smart TV" application, and other comparable applications and services that enable subscribers to view video programming distributed on Defendants' cable system on a video display device of their choice in the home; and that, on March 31, 2011, certain of the Defendants issued a press release, and refer to the contents of that press release for the complete terms thereof.  Defendants deny the remaining allegations in Paragraph No. 88 of the Complaint.

89.     Defendants deny the allegations in Paragraph No. 89 of the Complaint.

## COUNT II

### (Breach of Contract - Unauthorized
### Distribution of MTVN Programming)

90.     Defendants repeat and reallege each and every response to paragraphs 1 through 89 of the Complaint above as if fully set forth herein.

91.     Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 91 of the Complaint.

92.     Defendants deny the allegations in Paragraph No. 92 of the Complaint.

93.     Defendants deny the allegations in Paragraph No. 93 of the Complaint.

94.     Defendants deny the allegations in Paragraph No. 94 of the Complaint.

95.    Defendants deny the allegations in Paragraph No. 95 of the Complaint.

## COUNT III

### (Breach of Contract - Unauthorized
### Use of the MTVN Trademarks)

96.    Defendants repeat and reallege each and every response to paragraphs 1 through 95 of the Complaint above as if fully set forth herein.

97.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 97 of the Complaint.

98.    Defendants deny the allegations in Paragraph No. 98 of the Complaint.

99.    Defendants deny the allegations in Paragraph No. 99 of the Complaint.

100.    Defendants deny the allegations in Paragraph No. 100 of the Complaint.

101.    Defendants deny the allegations in Paragraph No. 101 of the Complaint.

## COUNT IV

### (Breach of Contract - Materially Degrading
### Quality of MTVN Programming)

102.    Defendants repeat and reallege each and every response to paragraphs 1 through 101 of the Complaint above as if fully set forth herein.

103.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 103 of the Complaint.

104.    Defendants deny the allegations in Paragraph No. 104 of the Complaint.

105.    Defendants deny the allegations in Paragraph No. 105 of the Complaint.

106.    Defendants deny the allegations in Paragraph No. 106 of the Complaint.

107.    Defendants deny the allegations in Paragraph No. 107 of the Complaint.

## COUNT V

### (Breach of Contract - Unauthorized
### Distribution of Comedy Central Programming)

108.   Defendants repeat and reallege each and every response to paragraphs 1 through 107 of the Complaint above as if fully set forth herein.

109.   Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 109 of the Complaint.

110.   Defendants deny the allegations in Paragraph No. 110 of the Complaint.

111.   Defendants deny the allegations in Paragraph No. 111 of the Complaint.

112.   Defendants deny the allegations in Paragraph No. 112 of the Complaint.

113.   Defendants deny the allegations in Paragraph No. 113 of the Complaint.

## COUNT VI

### (Breach of Contract - Unauthorized Use
### of the Comedy Partners Trademarks)

114.   Defendants repeat and reallege each and every response to paragraphs 1 through 113 of the Complaint above as if fully set forth herein.

115.   Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 115 of the Complaint.

116.   Defendants deny the allegations in Paragraph No. 116 of the Complaint.

117.   Defendants deny the allegations in Paragraph No. 117 of the Complaint.

118.   Defendants deny the allegations in Paragraph No. 118 of the Complaint.

119.   Defendants deny the allegations in Paragraph No. 119 of the Complaint.

## COUNT VII

### (Breach of Contract - Materially Degrading
### Quality of Comedy Central Programming)

120.   Defendants repeat and reallege each and every response to paragraphs 1 through 119 of the Complaint above as if fully set forth herein.

121.   Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 121 of the Complaint.

122.   Defendants deny the allegations in Paragraph No. 122 of the Complaint.

123.   Defendants deny the allegations in Paragraph No. 123 of the Complaint.

124.   Defendants deny the allegations in Paragraph No. 124 of the Complaint.

125.   Defendants deny the allegations in Paragraph No. 125 of the Complaint.

## COUNT VIII

### (Breach of Contract - Unauthorized
### Distribution of BET Programming)

126.   Defendants repeat and reallege each and every response to paragraphs 1 through 125 of the Complaint above as if fully set forth herein.

127.   Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 127 of the Complaint.

128.   Defendants deny the allegations in Paragraph No. 128 of the Complaint.

129.   Defendants deny the allegations in Paragraph No. 129 of the Complaint.

130.   Defendants deny the allegations in Paragraph No. 130 of the Complaint.

131.   Defendants deny the allegations in Paragraph No. 131 of the Complaint.

## COUNT IX

### (Breach of Contract - Unauthorized
### Use of the BET Trademarks)

132.    Defendants repeat and reallege each and every response to paragraphs 1 through 131 of the Complaint above as if fully set forth herein.

133.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 133 of the Complaint.

134.    Defendants deny the allegations in Paragraph No. 134 of the Complaint.

135.    Defendants deny the allegations in Paragraph No. 135 of the Complaint.

136.    Defendants deny the allegations in Paragraph No. 136 of the Complaint.

137.    Defendants deny the allegations in Paragraph No. 137 of the Complaint.

## COUNT X

### (Breach of Contract – Materially Degrading
### Quality of BET Programming)

138.    Defendants repeat and reallege each and every response to paragraphs 1 through 137 of the Complaint above as if fully set forth herein.

139.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 139 of the Complaint.

140.    Defendants deny the allegations in Paragraph No. 140 of the Complaint.

141.    Defendants deny the allegations in Paragraph No. 141 of the Complaint.

142.    Defendants deny the allegations in Paragraph No. 142 of the Complaint.

143.    Defendants deny the allegations in Paragraph No. 143 of the Complaint.

## COUNT XI

### (Breach of Contract - Unauthorized
### Distribution of CMT Programming)

144.   Defendants repeat and reallege each and every response to paragraphs 1 through 143 of the Complaint above as if fully set forth herein.

145.   Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 145 of the Complaint.

146.   Defendants deny the allegations in Paragraph No. 146 of the Complaint.

147.   Defendants deny the allegations in Paragraph No. 147 of the Complaint.

148.   Defendants deny the allegations in Paragraph No. 148 of the Complaint.

149.   Defendants deny the allegations in Paragraph No. 149 of the Complaint.

## COUNT XII

### (Breach of Contract - Unauthorized
### Use of the CMT Trademarks)

150.   Defendants repeat and reallege each and every response to paragraphs 1 through 149 of the Complaint above as if fully set forth herein.

151.   Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 151 of the Complaint.

152.   Defendants deny the allegations in Paragraph No. 152 of the Complaint.

153.   Defendants deny the allegations in Paragraph No. 153 of the Complaint.

154.   Defendants deny the allegations in Paragraph No. 154 of the Complaint.

155.   Defendants deny the allegations in Paragraph No. 155 of the Complaint.

## COUNT XIII

### (Breach of Contract - Materially Degrading
### Quality of CMT Programming)

156.   Defendants repeat and reallege each and every response to paragraphs 1 through 155 of the Complaint above as if fully set forth herein.

157.   Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof.  Defendants deny the remaining allegations in Paragraph No. 157 of the Complaint.

158.   Defendants deny the allegations in Paragraph No. 158 of the Complaint.

159.   Defendants deny the allegations in Paragraph No. 159 of the Complaint.

160.   Defendants deny the allegations in Paragraph No. 160 of the Complaint.

161.   Defendants deny the allegations in Paragraph No. 161 of the Complaint.

## COUNT XIV

### (Copyright Infringement – 17 U.S.C. § 501)

162.   Defendants repeat and reallege each and every response to paragraphs 1 through 161 of the Complaint above as if fully set forth herein.

163.   Defendants admit that Plaintiffs have attached to the Complaint copies of what Plaintiffs allege to be Certificates of Registration from the United States Copyright Office, in which certain of the Plaintiffs are identified as the author, but lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the remainder of Paragraph No. 163 of the Complaint and, therefore, deny the same.

164.   Defendants deny the allegations in Paragraph No. 164 of the Complaint.

165.   Defendants deny the allegations in Paragraph No. 165 of the Complaint.

166.   Defendants deny the allegations in Paragraph No. 166 of the Complaint.

167.    Defendants deny the allegations in Paragraph No. 167 of the Complaint.

168.    Defendants deny the allegations in Paragraph No. 168 of the Complaint.

## COUNT XV

### (Trademark Infringement – 15 U.S.C. § 1114)

169.    Defendants repeat and reallege each and every response to paragraphs 1 through 168 of the Complaint above as if fully set forth herein.

170.    Defendants admit that Plaintiffs have attached to the Complaint copies of what Plaintiffs allege to be service mark registrations with the United States Patent and Trademark Office, in which certain of the Plaintiffs are identified as the owner, but lack knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the remainder of Paragraph No. 170 of the Complaint and, therefore, deny the same.

171.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 171 of the Complaint.

172.    Defendants admit that certain of the Defendants entered into the Viacom Affiliation Agreements, and refer to those agreements for the terms thereof. Defendants deny the remaining allegations in Paragraph No. 172 of the Complaint.

173.    Defendants deny the allegations in Paragraph No. 173 of the Complaint.

174.    Defendants deny the allegations in Paragraph No. 174 of the Complaint.

175.    Defendants deny the allegations in Paragraph No. 175 of the Complaint.

176.    Defendants deny the allegations in Paragraph No. 176 of the Complaint.

177.    Defendants deny the allegations in Paragraph No. 177 of the Complaint.

178.    Defendants deny the allegations in Paragraph No. 178 of the Complaint.

179.    Defendants deny the allegations in Paragraph No. 179 of the Complaint.

## COUNT XVI

### (False Designation of Origin – 15 U.S.C. § 1125)

180.   Defendants repeat and reallege each and every response to paragraphs 1 through 179 of the Complaint above as if fully set forth herein.

181.   Defendants deny the allegations in Paragraph No. 181 of the Complaint.

182.   Defendants deny the allegations in Paragraph No. 182 of the Complaint.

183.   Defendants deny the allegations in Paragraph No. 183 of the Complaint.

184.   Defendants deny the allegations in Paragraph No. 184 of the Complaint.

185.   Defendants deny the allegations in Paragraph No. 185 of the Complaint.

186.   Defendants deny the allegations in Paragraph No. 186 of the Complaint.

187.   Defendants deny the allegations in Paragraph No. 187 of the Complaint.

188.   Defendants deny the allegations in Paragraph No. 188 of the Complaint.

## COUNT XVII

### (Common Law Unfair Competition)

189.   Defendants repeat and reallege each and every response to paragraphs 1 through 188 of the Complaint above as if fully set forth herein.

190.   Defendants deny the allegations in Paragraph No. 190 of the Complaint.

191.   Defendants deny the allegations in Paragraph No. 191 of the Complaint.

192.   Defendants deny the allegations in Paragraph No. 192 of the Complaint.

193.   Defendants deny the allegations in Paragraph No. 193 of the Complaint.

## PRAYER FOR RELIEF

Defendants deny any allegations set forth in the "Prayer for Relief" and deny that the Plaintiffs' claims have any basis in fact or law or that Plaintiffs are entitled to any of the relief that they seek.

To the extent a response to any allegation of the Complaint has not been provided in the preceding paragraphs, it is denied.

## AFFIRMATIVE AND OTHER DEFENSES

Defendants allege the following affirmative defenses to the Complaint and in doing so do not concede that they bear the burden of proof or persuasion on any of them:

### FIRST DEFENSE

Plaintiffs fail to state a claim, in whole or in part, upon which relief can be granted.

### SECOND DEFENSE

Plaintiffs' claims, if any, are barred, in whole or in part, by the doctrine of unclean hands.

### THIRD DEFENSE

Plaintiffs' claims, if any, are barred, in whole or in part, by the doctrines of waiver, laches, and/or estoppel.

### FOURTH DEFENSE

Plaintiffs' claims, if any, are barred, in whole or in part, by Plaintiffs' failure to suffer any damages.

### FIFTH DEFENSE

Plaintiffs' claims, if any, are barred, in whole or in part, by Plaintiffs' failure to mitigate any alleged damages.

### SIXTH DEFENSE

Plaintiffs' claims, if any, are barred based on their breach of the Viacom Affiliation Agreements.

## SEVENTH DEFENSE

Plaintiffs' damages, if any, are speculative, and thus are not recoverable.

## EIGHTH DEFENSE

Plaintiffs' damages, if any, are barred in whole or in part by the terms of the Viacom Affiliation Agreements.

## NINTH DEFENSE

Plaintiffs' claims, if any, are barred, in whole or in part, by Defendants' licenses and other rights set forth in the Viacom Affiliation Agreements.

## TENTH DEFENSE

Plaintiffs' claims, if any, for equitable relief are barred because Plaintiffs have an adequate remedy at law.

## ELEVENTH DEFENSE

Plaintiffs are not entitled to any injunctive or equitable relief because they will not suffer irreparable harm.

## TWELFTH DEFENSE

Plaintiffs' claims, if any, are limited to a contract remedy under the terms of the Viacom Affiliation Agreements that Plaintiffs allege.

## THIRTEENTH DEFENSE

Plaintiffs' request for punitive and/or statutory damages may violate protections of the United States Constitution including but not limited to Defendants' rights under the Fifth and Fourteenth Amendments to the United States Constitution.

## FOURTEENTH DEFENSE

Plaintiffs' claims, if any, are barred, in whole or in part, by the doctrine of misuse of copyright.

## FIFTEENTH DEFENSE

Plaintiffs' claims, if any, are barred, in whole or in part, by the doctrine of fair use.

## SIXTEENTH DEFENSE

Defendants reserve the right to raise additional affirmative and other defenses as may be established by discovery and the evidence in this proceeding.

## AMENDED COUNTERCLAIMS

Counterclaim-Plaintiffs Time Warner Cable Inc. ("TWC"), Time Warner Entertainment Company L.P., and Time Warner Cable LLC (together the "TWC Counterclaim-Plaintiffs"), by and through their undersigned attorneys, bring these counterclaims against Counterclaim-Defendants Viacom International Inc. ("Viacom"), MTV Networks ("MTVN"), a division of Viacom International Inc., Comedy Partners, BET Holdings LLC ("BET"), and Country Music Television, Inc. ("CMT") (together, the "Viacom Counterclaim-Defendants"), and allege as follows:

## NATURE OF THIS ACTION

1. The Counterclaims asserted here fall into two categories, both arising directly out of the agreements underlying the claims in this Action (together, as defined below at ¶ 50, the "Viacom Affiliation Agreements").

2. First, the TWC Counterclaim-Plaintiffs bring claims against the Viacom Counterclaim-Defendants for declaratory judgment to clarify TWC's broad right to exhibit and distribute Viacom's programming (the "Viacom Services"), including the networks *BET, CMT, Comedy Central, MTV, MTV2, Nickelodeon/Nick at Nite, Spike, VH1, and VH1 Classic*, to TWC subscribers utilizing TWC's cable system and, specifically, to make the Viacom Services

available to TWC cable subscribers who wish to view their programming on additional screens – such as the iPad – in their homes.

    3.    In the alternative, should the Court accept Viacom's allegations and find that the delivery of programming to iPads or other screens in the home constitutes "Internet" or "online" distribution that does not fall within TWC's existing distribution rights, TWC brings claims for breach of contract and declaratory judgment arising out of separate provisions of the parties' agreements concerning Internet or online distribution. Viacom has granted iPad and other IP device distribution rights to third parties, and to the extent that doing so constitutes a grant of rights for an Internet or online service, Viacom is required to offer TWC either identical distribution rights or the right to terminate certain of the Viacom Services. TWC is automatically entitled to terminate other Viacom Services as a result of the grant of Internet or online rights to third parties. In short, while TWC maintains that its TWCable TV iPad App is not an Internet or online service, Viacom has failed to honor the obligations that would naturally flow from its contrary allegations. Thus, if those allegations are accepted, TWC is entitled to damages and to terminate its distribution of certain of the Viacom Services.

    4.    Second, TWC brings counterclaims against certain Counterclaim Defendants (*i.e.*, Country Music Television, Inc., Viacom International Inc. and MTV Networks, referred to collectively as the "CMT Counterclaim Defendants") for breach of the Viacom Affiliation Agreements as they relate to TWC's right to carry and distribute the Country Music Television ("CMT") network (collectively, the "CMT Agreement"). The CMT Agreement contains a strict obligation describing the nature of the programming that TWC contracted to license (known in industry parlance as a "Content Clause") designed to ensure that the content of the programming offered on CMT does not materially deviate from what the CMT Counterclaim-Defendants

contractually agreed to provide and TWC agreed to pay for and carry.  As set forth herein, the CMT Counterclaim-Defendants have breached that provision.

### *Overview of the iPad Counterclaims*

5.   In clear contravention of the grant of rights in the Viacom Affiliation Agreements, the Viacom Counterclaim-Defendants have brought this legal action against the TWC Counterclaim-Plaintiffs for distributing certain of the Viacom Services to TWC video subscribers who wish to use their iPads in their homes as an additional screen to view their cable service, which includes certain of the Viacom Services.

6.   Viacom's suit ignores the uncontestable fact that the Viacom Affiliation Agreements do not in any way limit the types of video display devices upon which TWC video subscribers may view programming provided through TWC's cable system.  The devices subscribers use to view programming in their homes have evolved over time from analog vacuum tube devices to flat screens – both plasma and LCDs – and now Smart TV's and tablets, such as iPads.  In anticipation of the changing marketplace for electronics capable of viewing video programming, TWC intentionally obtained broad distribution rights in the Viacom Affiliation Agreements that are silent as to devices – whether the initial receive device (*e.g.*, a set-top box, a cable modem, a video game console, or other devices) or the display device (*e.g.*, black and white or color, 21" cathode ray tube TV or 55" flat plasma display or 9" tablet), thereby preserving a subscriber's ability to utilize multiple types and categories of video display devices without restriction, so long as that distribution takes place over TWC's cable system.  The distribution rights also give TWC the flexibility to employ appropriate signal formats and transmission technologies within TWC's cable system that enable its subscribers to use these different video display devices in their homes.

7.  Consistent with its rights under the Viacom Affiliation Agreements, on March 15, 2011, TWC launched its TWCable TV iPad App, through which TWC makes certain cable programming viewable by its video subscribers on Apple iPad tablet computers within the subscribers' homes ("in-home iPad viewing").

8.  TWC distributes the video programming for in-home iPad viewing solely through TWC's existing cable system. That is, the same "pipe" that delivers video programming to set-top boxes in its subscribers' homes is also used to deliver video programming to the iPad tablet. In many of its subscribers' homes, TWC distributes multiple "simulcast" versions of the same network in different formats so that the network can be received on the various devices in the subscribers' homes: for example, an analog format version that can be received in the cathode ray tube set in the basement, a standard definition digital version for the digital set in the kitchen, a high definition version for the large flat plasma screen in the family room, and now an IP format version that is compatible with the new generation of "Smart TVs" that combine television and computer capabilities in one device, with tablets, such as iPads, and with video game consoles. In-home iPad viewing simply enables TWC's video subscribers to use the iPad as an additional display device within their homes, allowing them to view on their iPad the programming that they subscribe to and have paid for – and for which TWC has handsomely paid Viacom – without the need to obtain another set-top box or television.

9.  Importantly, TWC does _not_ distribute the video programming to the iPad over the public Internet. Rather, the signal is delivered to a subscriber's iPad through TWC's private and secure cable system. Subscribers are able to view the programming only in their homes. TWC video subscribers have in-home iPad viewing access only to those channels for which they have already paid through their cable video subscriptions. TWC takes substantial security measures to

prevent unauthorized access to the video programming, and to ensure that all of the users of in-home iPad viewing subscribe to, and therefore pay for, any channel that they watch.

10.     Although the format employed by TWC for distribution to the iPad is commonly referred to as "IP," referring to the "Internet Protocol" format, that distribution format does not make use of the public Internet and does not present a meaningful distinction from TWC's other cable services. On the contrary, IP-format is becoming an industry standard for high-definition television transmission. For instance, AT&T's U-Verse multichannel video programming distribution service, which reports over three million subscribers, purportedly employs a fully IP-format based distribution system. Moreover, the Federal Communication Commission ("FCC") recognized that IP-format "has overwhelming marketplace support" and, in its "Third Report and Order and Order on Reconsideration" issued on October 14, 2010 and effective on August 8, 2011, the FCC requires cable operators to include an IP-format connection on all high-definition set-top boxes they acquire for distribution by December 1, 2012. Much like the shift from analog to digital transmission, IP-format is simply another step in the evolution of transmission protocols for sending television programming over cable systems.

11.     TWC has always looked to satisfy its subscribers' desire to enjoy their video programming on a variety of video display devices linked to the TWC cable system. The iPad is simply one of the many types of display devices through which TWC has provided service to its subscribers. For instance, in 2005, TWC launched an IP-format service in San Diego called "Broadband TV" that, like the TWCable TV iPad App, utilized the TWC cable system to enable subscribers to view licensed video programming on another video display device – in that case a computer screen. Although Viacom initially sent a cease-and-desist letter to TWC expressing concerns about Broadband TV, after TWC explained that the service was limited to in-home

viewing of paid-for programming services over TWC's cable system – not the Internet – Viacom

raised no further concerns, and Broadband TV continued under the then-existing agreements

with Viacom until Broadband TV was discontinued by TWC in 2007. Subsequently, in amended

agreements for the Viacom Services, Viacom did not seek to describe or limit the types of

devices upon which subscribers viewed programming distributed over the TWC cable system. In

fact, Viacom negotiated the Second Amendment Core Services Agreement (defined below),

which was finalized in January 2006 and extended the term of the Core Services Agreement

(defined below) for another █████ years, *with full knowledge of the then-ongoing provision of*

*Broadband TV*. All of the Viacom Affiliation Agreements were further extended in January

2009. Despite its documented complaints regarding Broadband TV, Viacom did not limit the

scope of the grant of rights in either of these contractual extensions.

12.    In late 2010 and early 2011, TWC began to preview its development of

applications to enable in-home tablet viewing with an announcement by TWC's CEO on

December 6, 2010, at the UBS Global Media and Communications Conference, and a public

demonstration of what would become in-home iPad viewing, using a tablet device from another

consumer electronics manufacturer. The announcement garnered widespread notice in the trade

press.

13.    On December 14, 2010, Sandra Wells, SVP, Business & Legal Affairs at MTV

Networks, a division of Viacom, wrote to Michelle Kim, Group Vice President & Chief Counsel,

Programming, at TWC regarding TWC's CEO's public statements and unjustifiably stated "our

affiliation agreements do not authorize TWC to distribute the MTVN and BETN services to

iPads." On January 18, 2011, Ms. Kim responded to Ms. Wells, stating that the Viacom

Affiliation Agreements provide "no limitations on the types of devices to which TWC can distribute your signals and our carriage rights are quite broad . . . ."

14. On March 15, 2011, TWC launched the TWCable TV iPad App, allowing video subscribers who otherwise already receive cable programming from TWC in their homes to view a selection of that same programming on Apple iPad tablets in their homes. In-home iPad viewing has proven to be extremely popular with TWC video subscribers. Between March 15, 2011, when TWC first made in-home iPad viewing available, and September 30, 2011, the TWCable TV iPad Apps had been downloaded more than 1.5 million times.

15. Notwithstanding Viacom's assent to TWC's previous Broadband TV service, on March 15, 2011, counsel for Viacom Inc., Peter Zimroth at Arnold & Porter LLP, sent a cease and desist letter to Marc Lawrence-Apfelbaum, EVP and General Counsel at TWC, claiming that "Viacom would consider any launch of an iPad application using its copyrighted content as a serious and material breach of the Affiliation Agreement and an infringement of its exclusive rights under copyright law."

16. TWC responded by letter to Viacom's counsel on March 16, 2011, vigorously denying any wrongdoing and explaining to Viacom's counsel why Viacom's legal and factual position was baseless. TWC has at all times acted within its contractual rights under the Viacom Affiliation Agreements, and Viacom has not and cannot identify any contractual provisions of the Viacom Affiliation Agreements that are violated by TWC subscribers' use of in-home iPad viewing.

17. On March 31, 2011, TWC, without prejudice to its rights, removed the Viacom Services from the programming that it offers its subscribers via in-home iPad viewing and replaced those networks with programming from cable programmers that had not objected to

iPad viewing of their programming. Because the Viacom Affiliation Agreements allow TWC video subscribers the flexibility to receive and watch the programming for which they have paid on any video display device in the home, TWC filed an action in this Court on April 8, 2011 seeking a declaration to make clear that TWC has the right under the Viacom Affiliation Agreements to make the Viacom Services available on any screen capable of receiving such programming over TWC's cable system. The TWC Counterclaim-Plaintiffs assert this counterclaim for the same purpose.

### *Overview of the Alternative iPad Counterclaims*

18. In the alternative, TWC brings claims for breach of contract and declaratory judgment should the Court find that the TWCable TV iPad App constitutes "Internet" or "online" distribution of the Viacom Services that is not permitted under the Viacom Affiliation Agreements. As set forth in detail below, certain of the parties' agreements require Viacom to offer TWC identical rights to distribute the Viacom Services with respect to Internet or online services as Viacom has offered to third parties. Viacom recently entered into an agreement with Cablevision Systems Corporation and CSC Holdings, LLC (collectively "Cablevision") resolving claims very similar to those at issue in this litigation. On August 10, 2011, in a joint public statement, Viacom and Cablevision announced that they had "agreed to resolve their pending litigation, and the Viacom programming will continue to appear on Cablevision's Optimum Apps for iPad and other IP devices." If "Cablevision's Optimum Apps for iPad," which is delivered in substantially the same manner as TWC's iPad App, or distribution on "other IP devices" constitutes Internet or online services through which distribution is not permitted under the Viacom Affiliation Agreements, then Viacom's grant of such rights to Cablevision without offering identical rights to TWC constitutes a breach of certain of the

Viacom Affiliation Agreements, and entitles TWC to terminate its distribution of certain of the

Viacom Services and accordingly cease paying significant license fees for those services.

### *Overview of the CMT Counterclaim*

19.    Contrary to allegations made in this action, the CMT Counterclaim-Defendants

have *not* fully performed their contractual obligations, but instead are in material breach of the

Content Clause obligations of the CMT Agreement. (See ¶¶ 118-143, *infra*.)

20.    Put simply, CMT has all but ceased providing country music-related television

during key afternoon and "prime-time" hours (defined in the CMT Agreement as 8:00 pm to

11:00 pm Monday through Saturday and 7:00 pm to 10:00 pm Sunday).  In place of such

programming, CMT now provides an assortment of "reality television" shows, movies and series

that have little or no connection to country music, many of which originated on other networks,

including Viacom's own networks.

21.    The CMT Counterclaim-Defendants contracted to provide country music-related

programming on CMT that is consistent with the type of programming that was aired on the

network in the first half of 2004, as reflected by a programming schedule annexed to the CMT

Agreement (the "2004 Programming Grid").  Although the CMT Counterclaim-Defendants

retained discretion to control CMT's schedule on a day-to-day basis, they explicitly agreed that

they would not "materially deviate" from the 2004 Programming Grid during the term of the

agreement.

22.    That content provision of the CMT Agreement and similar provisions in TWC's

other affiliation agreements are essential to maintain TWC's editorial discretion over the nature

and the mix of programming offered to TWC subscribers.  A decision by TWC to enter into an

agreement with programmers such as the CMT Counterclaim-Defendants is based in part on

TWC's assessment of how the proposed service fits into or complements the overall slate of

networks and programs offered on TWC's cable systems. In this way, TWC seeks to create and maintain the most compelling programming mix for its subscribers. The CMT Counterclaim-Defendants' material deviation from what they agreed to provide frustrates TWC's ability to manage the mix of services offered to TWC subscribers. Thus, whether CMT's programming is "better" or "worse" according to CMT or any particular viewer or demographic group is irrelevant for purposes of this Counterclaim.

23.    Yet, CMT programming today has very little in common with the 2004 Programming Grid. Indeed, an analysis of the 2004 Programming Grid demonstrates that during the relevant 2004 time period, country music videos and concerts accounted for approximately 40% of CMT's prime-time programming and programs profiling country musicians and their music accounted for an additional 19%. Such country music programming thus accounted for approximately *60%* of CMT's prime-time programming in the 2004 period referenced in the contract.

24.    During the equivalent time period in 2011, those content categories (country music videos, concerts and profiles) accounted for *less that 1%* of prime-time programming.

25.    Moreover, in the relevant 2004 period, CMT aired only *one* program that originated on another network — a *60 Minutes* special about a country-musician – and the rest was programming unique to CMT. During the same period in 2011, programming from other networks (*i.e.*, networks, including Viacom's own networks, that TWC separately pays to distribute) accounted for over 20% of CMT's programming (including approximately 20% of prime-time programming).

26.    Making matters worse, CMT recently announced with significant promotional fanfare that it will deviate even further from the 2004 Programming Grid. In February 2011,

CMT issued a press release stating that it had hired a new Executive Vice-President for Development who would push CMT "in *new directions* that will expand programming *in surprising ways*," and "take CMT *on a wild ride.*" Press Release, Country Music Television, Jayson Dinsmore Joins CMT as Executive Vice President, Development (Feb. 2, 2011), available at   http://www.cmtpress.com/pressreleases/details.cfm?PressReleaseID=1000730   (emphasis added).

27.    On August 22, 2011, CMT announced that it had hired Eliot Goldberg (who has extensive experience with reality television such as "Keeping Up With The Kardashians"), and Jayson Dinsmore was quoted as remarking that "I'm thrilled to welcome Eliot to CMT as we continue to take huge, aggressive strides in our original programming development."

28.    Then, in September 2011, CMT announced a Fall 2011 lineup of all new, non-country music-related programs scheduled to launch in October and November 2011, including *Top Secret Recipe, Trick My What?, Dallas Cowboys Cheerleaders: Making the Team*, and a new made-for-TV movie.

29.    TWC's bargained-for Content Clause was intended precisely to avoid "wild rides" and "surprising" and "huge" changes to CMT's programming.

30.    When a programmer such as CMT fails to adhere to a content clause such as the one at issue here, TWC's entire programming mix, and the underlying basis of its decision to enter into the relevant agreement, is affected. The problem is particularly apparent here, where CMT now provides extensive amounts of programming that originated on other networks, including Viacom's own networks, that TWC already pays for and carries, thus acutely undermining the diversity of programming available to TWC subscribers and forcing TWC to pay twice for the same programming.

31.    TWC became aware of and began closely tracking CMT's breach of its content

obligations in 2010. Despite months of protest by TWC during which it detailed its concerns

over CMT's radical transformation, the CMT Counterclaim-Defendants have refused to adhere

to their contractual obligations with respect to CMT.

32.    CMT's programming no longer comports with the type of programming that the

CMT Counterclaim-Defendants agreed to provide. For that reason, the CMT Counterclaim-

Defendants are in breach of the CMT Agreement.

## THE PARTIES

33.    Counterclaim-Plaintiff Time Warner Cable Inc. is a Delaware corporation with its

principal office at 60 Columbus Circle, New York, New York 10023. TWC is the second-largest

cable television operator in the United States, with approximately 14.5 million customers who

subscribe to one or more of its video, high-speed data, and voice services.

34.    Counterclaim-Plaintiff Time Warner Cable LLC is a Delaware limited liability

company with its principal office at 60 Columbus Circle, New York, New York 10023.

35.    Counterclaim-Plaintiff Time Warner Entertainment Company L.P. is a Delaware

limited partnership with its principal office at 60 Columbus Circle, New York, New York 10023.

36.    Counterclaim-Defendant Viacom International Inc. is a Delaware corporation.

Viacom is a global entertainment content company, providing television programming, motion

pictures, and a wide range of digital media.

37.    Counterclaim-Defendant MTV Networks is a division of Viacom International Inc.

38.    Counterclaim-Defendant Comedy Partners, an affiliate of Viacom, is a general

partnership formed in New York.

39.    Counterclaim-Defendant BET Holdings LLC, an affiliate of Viacom, and a

successor in interest to Black Entertainment Television, Inc., is a Delaware limited liability

company. Upon information and belief, one or more members of the limited liability company include entities organized under the laws of New York.

40.    Counterclaim-Defendant Country Music Television, Inc., an affiliate of Viacom, is a Tennessee corporation.

## JURISDICTION AND VENUE

41.    An actual and justiciable controversy exists between the TWC Counterclaim-Plaintiffs and the Viacom Counterclaim-Defendants concerning the non-infringement of the Viacom Counterclaim-Defendants' copyrights by the TWC Counterclaim-Plaintiffs and TWC's subscribers by virtue of the Viacom Counterclaim-Defendants' allegations of infringement against the TWC Counterclaim-Plaintiffs. Accordingly, subject matter jurisdiction for this declaratory judgment action is proper in this Court under 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

42.    Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over the state claims herein because these claims are related to, and form part of, the same case and controversy as the federal claims herein.

43.    This Court has personal jurisdiction over Counterclaim-Defendant Viacom International Inc. because Viacom International Inc. is principally located in the State of New York and regularly does business in the State of New York and/or by virtue of Viacom International Inc.'s significant contacts with the State of New York relating to the Viacom Affiliation Agreements to which it is a party.

44.    This Court has personal jurisdiction over Counterclaim-Defendant Comedy Partners because Comedy Partners is principally located in the State of New York and regularly does business in the State of New York and/or by virtue of Comedy Partners' significant contacts with the State of New York relating to the Viacom Affiliation Agreements to which it is a party.

45.    This Court has personal jurisdiction over Counterclaim-Defendant BET Holdings LLC because BET Holdings LLC regularly does business in the State of New York and/or by virtue of BET Holdings LLC's significant contacts with the State of New York relating to the Viacom Affiliation Agreements. Furthermore, upon information and belief, one or more members of the limited liability company include entities organized under the laws of New York and/or with their principal place of business in New York.

46.    This Court has personal jurisdiction over Counterclaim-Defendant Country Music Television, Inc. because, under Country Music Television, Inc.'s agreement with TWC, the parties agreed to consent to personal jurisdiction in the State of New York for any proceeding arising out of or relating to the agreement between the parties. CMT Agreement § 19(c) (Jan. 1, 1999). Furthermore, this Court has personal jurisdiction over Country Music Television, Inc. because Country Music Television, Inc. regularly does business in the State of New York and/or by virtue of Country Music Television, Inc.'s significant contacts with the State of New York relating to the Viacom Affiliation Agreements to which it is a party.

47.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c), and 1400(a).

## FACTUAL BACKGROUND

48.    Counterclaim-Plaintiff TWC is the second largest cable operator in the United States, with technologically advanced systems located mainly in five geographic areas: New York State (including New York City), the Carolinas, Southern California (including Los Angeles), Ohio and Texas. As of June 30, 2011, TWC served approximately 14.5 million customers who subscribe to one or more of its video, high-speed data, and voice services.

49.    Viacom is a global entertainment content company, providing television programming, motion pictures, and a wide range of digital media. Viacom's television business is organized into the MTV Networks ("MTVN") and the BET Networks ("BETN") divisions.

39

BETN provides the *BET* and *Centric* channels.  MTVN provides various cable networks, including *MTV, VH1, Nickelodeon/Nick at Nite, Comedy Central, CMT, Spike, TV Land*, and *Logo*.

### The Viacom Affiliation Agreements

50.   The Viacom Counterclaim-Defendants provide the Viacom Services to TWC, and TWC has rights to distribute those Viacom Services, under a series of interrelated agreements known as affiliation agreements and amendments thereto (together the "Viacom Affiliation Agreements"), which for the purposes herein, include:

(i) the agreement captioned "Country Music Television Affiliation Agreement" between Country Music Television, Inc. and TWC, dated as of January 1, 1999, regarding distribution of *CMT* (the "CMT Agreement");

(ii) the agreement captioned "Affiliation Agreement" between MTVN and TWC, dated as of August 10, 2000, regarding distribution of *Nickelodeon/Nick at Nite, MTV, VH1* and *Spike* (the "Core Services Agreement");

(iii) the agreement captioned "Affiliation Agreement - The Suite" between MTVN and TWC dated as of August 10, 2000, regarding distribution of *Nick Jr.* (f/k/a *Noggin*), *MTV2*, and *VH1 Classic* (the "Suite Services Agreement");

(iv) the agreement captioned "Affiliation Agreement Comedy Central" among MTVN, Comedy Partners, and TWC, dated as of April 21, 2003, regarding distribution of *Comedy Central* (the "Comedy Agreement");

(v) the agreement between MTVN and TWC, dated as of November 7, 1996, regarding distribution of *TV Land* (the "TV Land Agreement");

(vi) the agreement captioned "Black Entertainment Television Affiliation Agreement" between Black Entertainment Television, Inc. and TWC, dated as of November 1, 1995, regarding distribution of *BET* (the "BET Agreement");

(vii) the agreement captioned "BET On Jazz Affiliation Agreement" between Black Entertainment Television, Inc. and TWC, dated as of November 1, 1997, regarding distribution of *Centric* (f/k/a *BET on Jazz*) (the "Centric Agreement");

(viii) the letter agreement between MTVN and TWC, dated as of November 9, 2004, amending the Core Services Agreement (the "First Amendment Core Services Agreement");

(ix) the letter agreement between MTV and TWC, dated as of January 1, 2006, amending and extending the term of the Core Services Agreement ("Second Amendment Core Services Agreement");

(x) the term sheet captioned "Time Warner Cable/MTV Networks/BET Networks Term Sheet," dated as of January 1, 2009 (the "TWC/MTVN/BETN Term Sheet"); and

(xi) the letter agreement captioned "HD Simulcast Amendment," dated as of December 4, 2009 (the "HD Simulcast Amendment").

51.     The Viacom Affiliation Agreements constitute the binding agreements between the parties, as they specifically agreed that the Viacom Affiliation Agreements constitute the entire agreement between them with respect to the respective Viacom Services governed by those agreements. See Core Services Agreement § 16(c) (Aug. 10, 2000); see also Comedy Agreement § 15(c) (Apr. 21, 2003); BET Agreement § 11(d) (Nov. 1, 1995); CMT Agreement § 22 (Jan. 1, 1999).

52.     TWC has distributed the Viacom Services to its video subscribers pursuant to the Viacom Affiliation Agreements and has remitted over a billion dollars in fees to the Viacom Counterclaim-Defendants on the basis of the payment terms set forth in the Viacom Affiliation Agreements.

### The Grant of Rights to TWC

53.     The Viacom Affiliation Agreements broadly provide for TWC to distribute the Viacom Services through TWC's cable systems. See Core Services Agreement § 2(a) (Aug. 10, 2000) (

); see also Comedy Agreement § 2(a) (Apr. 21, 2003); BET Agreement

§ 1(a) (Nov. 1, 1995); CMT Agreement § 1(a) (Jan. 1, 1999). TWC's distribution rights include both analog and digital rights. Moreover, TWC has broad rights with respect to the high definition feeds of each of the Viacom Services, which are the specific feeds used in connection with the delivery of video programming for in-home iPad viewing. See HD Simulcast Amendment § 1 (Dec. 4, 2009) (███████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████).

54.     The devices subscribers use to view television in the home continually change and have evolved over time from analog vacuum tube devices to flat screen displays – both plasma and LCD's – and now Smart TV's, iPads and other tablets.

55.     The Viacom Affiliation Agreements do not place restrictions on the types of devices that subscribers can use to view programming distributed on TWC's cable system in their homes. Nothing in the Viacom Affiliation Agreements places any restriction on TWC's distribution of any of the Viacom Services via TWC's private cable system to video subscribers in their homes, or on the type or number of devices that may be used by TWC video subscribers to receive the Viacom Services over TWC's cable system. Nowhere in the Viacom Affiliation Agreements is TWC required to deliver the Viacom Services only to set-top boxes.

### TWC's "Broadband TV" Service in San Diego

56.     On or about July 8, 2005, TWC launched a service in San Diego that involved delivery of licensed content using the IP format to computers in the homes of TWC's video subscribers. The service was called "Broadband TV." The trade and local press widely covered the launch of Broadband TV.

57.     In-home iPad viewing is nothing more than a version of Broadband TV.  With Broadband TV, the video programming, which included many of the Viacom Services, was converted to IP format, was delivered in IP format using TWC's existing cable systems to video subscribers only, and was distributed only to the subscribers' homes.  The same is true of the TWCable TV iPad App.  With Broadband TV, those Viacom Services could be delivered to laptops and desktop computers, such that the subscriber could use an in-home wireless network in connection with accessing the video programming.

58.     By letter dated July 20, 2005, Viacom expressed purported concerns about Broadband TV, stating that "[i]t has come to our attention through press reports that [TWC] has launched a version of Internet-protocol TV which offers video and high-speed Internet subscribers the ability to view certain program services over the Internet on their computers [and that] such Internet distribution is in violation of the Affiliation Agreement between TWC and MTVN dated as of August 10, 2000, as amended."

59.     By letter dated July 22, 2005, TWC responded that Broadband TV "is being offered over our cable system, not on the Internet and is being provided solely to TWC expanded basic customers, who already receive those same programming services [and that the] service simply provides a simulcast of the expanded basic tier for which TWC San Diego customers already pay in another technical format."

60.     After TWC's explanation, which applies equally to in-home iPad viewing, Viacom raised no further concerns with TWC, and Broadband TV continued under the existing agreements with Viacom until January 2007, when TWC decided to discontinue Broadband TV.  As discussed above, the parties amended their various agreements multiple times after their July 2005 exchange of letters.  In fact, during the very period in which TWC offered Broadband TV

(*i.e.*, July 2005 through January 2007), the parties negotiated the Second Amendment Core Services Agreement which extended the term of the Core Services Agreement from ▮▮▮▮▮▮ through ▮▮▮▮▮▮▮▮▮▮. In none of those negotiations did any of the Viacom Counterclaim-Defendants ever seek to limit the scope of the grant of rights, which are the same grant of rights at issue here. None of the subsequent amendments expressly addressed Broadband TV or related issues.

61.    In reliance on the breadth of the grant of rights in the Viacom Affiliation Agreements and in part, upon Viacom's acquiescence in TWC's Broadband TV service in San Diego, TWC continued to develop new technological options that would enable its video subscribers to view its video programming on different video display devices within the home.

### *In-Home iPad Viewing*

62.    In late 2010, TWC began to preview its development of the TWCable TV iPad App to enable in-home iPad viewing. Glenn Britt, the Chairman and CEO of TWC, announced on December 6, 2010 at the UBS Global Media and Communications Conference that TWC was "working on [] an app that will stream our video service to the iPad. So if you want to use that as a TV screen in your home, you can."

63.    In January 2011, at the Consumer Electronics Show in Las Vegas, Nevada, TWC provided a public demonstration of what would become in-home iPad viewing using a tablet device from another consumer electronics manufacturer.

64.    These events were well-publicized and attended by a wide range of communications executives. TWC received numerous inquiries from the public and other programmers about these services. TWC's presentation at the Consumer Electronics Show was also made available on the Internet.

65. On March 15, 2011, TWC launched the TWCable TV iPad App, making cable television programming viewable by its video subscribers on their Apple iPads. Specifically, subscribers to TWC's cable services now have the option to view on their iPad, within their homes, channels to which they have access through their TWC cable system and subscription.

66. The technology for distributing video programming to cable television subscribers is constantly evolving. Indeed, TWC has long employed a variety of formats to distribute video programming over its "pipes" and into the home in order to optimize the video feed for the particular devices used by its subscribers.

67. The distribution of video programming to the subscriber's cable modem for in-home iPad viewing is functionally equivalent to the distribution of video programming to a TWC subscriber's set-top box for viewing on any other display device. The technology underlying the iPad distribution merely reflects another way in which TWC reformats the programming signals within its cable system, as it regularly does with respect to all types of video programming. In fact, in the Viacom Affiliation Agreements, the parties specifically contemplated that the cable that comes out of a subscriber's wall could plug into devices other than a set-top box connected to a television, such as a cable modem in this case. See Second Amendment Core Services Agreement § 2(a) (Jan. 1, 2006) (███████████████████████████████████████

███████████████████); see also First Amendment Core Services Agreement § 1 (Nov. 9,

2004) (███████████████████████████████████████████████

███████).

68. TWC video subscribers do not need to subscribe to TWC's High Speed Data Internet service in order to utilize the iPad App. To the contrary, any TWC video subscriber (even if they receive Internet service from a non-TWC provider) may download and utilize the

iPad App. Such "video-only" subscribers need only request deployment of a TWC cable modem in their homes, which will receive the iPad App signal and authenticate the user as a TWC video customer. In such cases, the TWC modem (which is supplied at no additional cost) is used solely for receiving the iPad App signal and transmitting it to the iPad, not for receiving Internet service. Such video-only subscribers may obtain Internet services from any provider they choose. Indeed, the customers do not need to be connected to the Internet or subscribe to any Internet Service Provider at all.

69.     In distribution of video programming both to set-top boxes and to iPads, the video programming signal is, in most cases, received via satellite from the programmer, converted by TWC into digital formats that are compatible with TWC's cable systems, transmitted in IP format to TWC's distribution hubs, and delivered into the subscriber's home through TWC's hybrid fiber-coaxial (HFC) network – all through TWC's cable systems.

70.     Specifically, TWC provides video programming to its subscribers predominantly in the following manner: network programmers deliver digital feeds via satellite to an Integrated Receiver/Decoder (IRD) located at a TWC facility. TWC usually receives this satellite feed either in MPEG-2 or MPEG-4 format. The feed is then transmitted to an encoder via Serial Digital Interface (SDI), Asynchronous Serial Interface (ASI) or Ethernet. A video re-encode process is employed to convert all signals to an MPEG-2 format and optimize it for distribution to the set-top box. The feed is then wrapped into an MPEG-2 transport stream, and transmitted to the TWC distribution hubs in IP format. It is then transmitted to TWC's subscribers across TWC-controlled cable systems and is ultimately delivered into the TWC video subscriber's home through a coaxial cable.

71.    The distribution of video programming to the subscriber's cable modem for in-home iPad viewing utilizes essentially the same process, except the video is re-encoded into H.264/MPEG-4 format and transmitted using HTTP Live Streaming (HLS) transport protocol, which is another IP transport format.

72.    Once TWC's HFC cables enter the TWC video subscriber's home, one feed enters a video subscriber's set-top box or other device set up to receive the signal, and another enters the video subscriber's cable modem. As noted, the video subscriber does not need to be a subscriber to TWC's High Speed Data Internet service in order to receive and utilize the iPad App signal. The video subscriber's cable modem receives a quadrature amplitude modulation ("QAM") modulated radio frequency signal containing encapsulated IP packets and redistributes those IP packets to a variety of home networks, including, for example, Ethernet and WiFi networks commonly used to render the programming on certain consumer electronic video display devices, including the iPad. Indeed, such modems are now being built into set-top boxes directly. Both set-top boxes and modems serve similar functions with regard to these feeds, such as by ensuring that the feed is securely transmitted to the viewing device (*e.g.*, a television, an iPad, or another display device) and ensuring that the customer is authorized to receive the channels.

73.    The video programming that is distributed via cable modem to a TWC video subscriber's iPad for in-home iPad viewing is never transmitted over the public Internet. The video programming is instead transmitted through TWC's proprietary, purpose-built cable system – whether delivered to an iPad, a set-top box, a personal computer with a cable card, or any of the many other devices a TWC video subscriber may have in the home that are capable of receiving the feed.

47

74. In order to view any of the networks on the iPad, TWC video subscribers must first download the TWCable TV iPad App from Apple's iTunes App Store and go through a series of authentication steps to ensure that the subscribers are in fact TWC video subscribers and that they are accessing the video programming from within their homes.

75. To enable in-home iPad viewing, TWC employs a number of authentication measures to ensure that the TWCable TV iPad App will function only over the TWC cable systems. Through these procedures, TWC confirms that the iPad is connected through an address authorized to operate on the TWC network, and that the subscriber is connected through his or her home cable modem, and requires that subscribers utilize passwords that verify they are TWC customers. In-home iPad viewing is limited to those channels to which the subscriber is entitled under the terms of his or her TWC subscription. Additionally, TWC's subscriber agreement requires its customers to encrypt the wireless routers they use to receive the signal on their iPads.

76. None of the video programming distributed for in-home iPad viewing is stored on the iPad.

77. Thus, just as TWC employs tight security measures in connection with set-top boxes to ensure that its programming is viewed or accessible only by authorized subscribers, it employs security measures for iPad viewers that provide comparable protection. TWC takes these substantial security measures, and more, to prevent unauthorized access to the video programming and to ensure that all of the users of the TWCable TV iPad App are paying for any channel that they watch.

78. TWC's provision of its application for in-home iPad viewing is merely an enhancement of features and transport that it otherwise employs in connection with the delivery

of its cable services to its existing subscribers. Enabling in-home iPad viewing is not the same as providing a broadband data or cable modem service. The programming is not viewed over the public Internet. It is just the same programming being distributed over the cable system onto a different screen within the home.

### *In-Home iPad Viewing Is Very Popular Among TWC Video Subscribers*

79.    The TWCable TV iPad App experienced high consumer demand on the first day of its release, ranking as the most frequently downloaded free "app" in Apple's iTunes App Store. This interest demonstrated clearly to TWC that its subscribers wanted to use their iPad as a viewing device in their homes.

80.    Between March 15, 2011 and September 30, 2011, the TWCable TV iPad Apps had been downloaded more than 1.5 million times.

### *Viacom's Cease and Desist Request*

81.    On March 15, 2011, after Viacom had been informed that the iPad App had been launched, counsel for Viacom Inc., Peter Zimroth of Arnold & Porter LLP, sent a cease and desist letter to Marc Lawrence-Apfelbaum, EVP and General Counsel, TWC, claiming that "Viacom would consider any launch of an iPad application using its copyrighted content as a serious and material breach of the Affiliation Agreement and an infringement of its exclusive rights under copyright law."

82.    TWC responded by letter to Viacom's counsel on March 16, 2011, vigorously denying any wrongdoing and explaining to Viacom's counsel why Viacom's legal and factual position was baseless. TWC has at all times acted within its contractual rights under the Viacom Affiliation Agreements, and Viacom has not and cannot identify any contractual provision of the Viacom Affiliation Agreements that are violated by TWC subscribers' use of in-home iPad viewing.

83.     The programming networks made available to subscribers for in-home iPad viewing on March 15, 2011, included *BET, CMT, Comedy Central, MTV, Nickelodeon/Nick at Nite, Spike,* and *VH1.*

84.     On March 31, 2011, TWC removed all of those Viacom Services from the programming that it offers to its subscribers for in-home iPad viewing and added other programming from cable networks that had not objected to iPad viewing of their programming. Currently, programming from over one hundred services is being made available on the iPad App.

### *Smart TV's and Other Video Display Device Applications for Subscribers*

85.     The Viacom Counterclaim-Defendants' refusal to abide by the grant of rights in the Viacom Affiliation Agreements has far broader implications than viewing over iPads. TWC will shortly enable other devices utilizing its cable system to view video programming. For example, television manufacturers are now introducing a next generation of Smart TV's, and TWC is in the process of creating an application for its subscribers to view programming on Smart TV's. Video programming can also be delivered to popular video game consoles (*e.g.* Microsoft's Xbox, Nintendo's Wii, or Sony's PlayStation), and TWC's competitors are currently delivering video programming to their subscribers through game consoles. There is no fundamental difference between the way TWC will distribute video programming over its cable system to iPads, video game consoles, Smart TV's, or other viewing screens and receiving devices.

86.     The principal benefit to TWC and its customers from using the IP format to serve devices, such as Smart TV's and video game consoles, is that it will eliminate the need for customers to lease set-top boxes from TWC, thereby saving them money and making viewing more convenient. Finding alternatives to set-top boxes has been a policy priority for the FCC, and TWC and other multichannel video programming distributors have been working to support

the policy and provide additional convenience for its customers. *See, e.g., In re Video Device Competition*, Notice of Inquiry, 25 F.C.C. Rcd. 4275 (April 21, 2010).

87.    TWC is fully authorized under the Viacom Affiliation Agreements to develop and launch an application for Smart TV's, video game consoles, as well as other comparable devices in the future, without having to seek consent from, or pay additional carriage fees to, the Viacom Counterclaim-Defendants.

## DISH Network Displays Viacom Programming on iPads

88.    By seeking to restrict TWC's ability to provide the Viacom Services to its paying subscribers through their iPad devices within their own homes, Viacom has put TWC at a competitive disadvantage vis-à-vis other multichannel video programming distributors of the Viacom Services.

89.    For example, DISH Network, one of the two largest satellite television providers that competes with TWC, has launched a similar service permitting delivery not only to an iPad but to almost any Internet-connected device, both inside and outside of the home. See Press Release, DISH Network, *DISH Network is First Pay-TV Provider to Give Customers Ability to Watch Their Live TV on iPad* (Dec. 1, 2010). Thus, unlike TWC, DISH Network offers its customers equipment that allows video programming to be viewed both in the home on a variety of devices, and also remotely over the public Internet.

90.    Upon information and belief, the Viacom Counterclaim-Defendants have not provided DISH with any special license allowing inside or outside-the-home distribution. Nor have the Viacom Counterclaim-Defendants taken any action to prevent DISH Network from displaying the Viacom Services on iPads or any other device inside or outside of the home.

### *Cablevision Displays Viacom Programming on iPads*

91.     On or about April 2, 2011, Cablevision launched its Optimum Apps for iPad that, like the TWCable TV iPad App, are designed to allow distribution of television programs through a cable modem to iPads. Viacom filed a lawsuit against Cablevision on June 23, 2011, premised on virtually identical allegations to those at issue here, asserting that Cablevision had breached its affiliation agreements with Viacom by distributing Viacom programming services through Cablevision's Optimum Apps for iPad. On or about August 10, 2011, Viacom and Cablevision announced an agreement resolving that litigation under which Viacom granted Cablevision the right to distribute the Viacom Services to "Cablevision's Optimum Apps for iPad and other IP devices," using the same type of IP-format distribution at issue here.

### *TWC's Right, in the Alternative, to Terminate*
### *Certain Viacom Services and Recover Damages*

92.     In correspondence since the filing of this litigation, Viacom's Assistant Vice President and Associate General Counsel (speaking on behalf of all the Viacom Counterclaim-Defendants) *admitted* that TWC does not distribute video programming to the iPad over the public Internet. That admission contradicts the Viacom Counterclaim-Defendants' false allegation in the Complaint, that TWC uses "broadband internet services to stream linear feeds of Viacom's . . . programming directly to iPad tablets."

93.     Nonetheless, should the Court find that the TWCable TV iPad App constitutes "internet" or "online" distribution of the Viacom Services not permitted under the Viacom Affiliation Agreements, it would mean that TWC has significant rights under certain of those agreements. In particular, Section 4(g)(B) of the Suite Services Agreement provides that if MTVN "█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

52



" (emphasis added). Section 4(g)(C) of the Suite Services Agreement provides TWC with the same termination right with respect to *VH1 Classic*.

94. TWC also has rights with respect to alternative distribution of Viacom Services governed by the Suite Services Agreement, the Core Services Agreement, and the Comedy Agreement. Section 4(g)(ii) of the Core Services Agreement and the equivalent provisions at Section 4(f)(ii) of the Comedy Agreement and at Section 4(g)(A) of the Suite Services Agreement (the "ADM Provisions") provide that if Viacom:



(emphasis added).

95. Thus, while TWC maintains and Viacom has admitted that the TWCable TV iPad App does *not* involve distribution of video over the Internet or online, if the Court accepts Viacom's allegation that TWC uses "broadband internet services to stream linear feeds of Viacom's . . . programming directly to iPad tablets," then Viacom's grant of iPad distribution rights to other cable service providers would have triggered TWC's vested right to terminate the Suite Services Agreement with respect to *MTV2* and *VH1 Classic*. Moreover, the Viacom Counterclaim-Defendants would have breached the triggered ADM Provisions such that TWC would be entitled to damages and to either (i) identical rights to sell or distribute certain Viacom Services governed by the Suite Services Agreement, the Core Services Agreement and the

Comedy Agreement; or (ii) the right to terminate the Suite Services Agreement, the Core

Services Agreement, and the Comedy Agreement with respect to impacted services.

## COUNT ONE

### (Declaratory Judgment – In-home iPad Viewing and
### Other Subscriber Viewing Applications)

96.    The TWC Counterclaim-Plaintiffs repeat and reallege the allegations in paragraphs

1 through 95, as if fully set forth herein.

97.    Under the terms of the Viacom Affiliation Agreements, the TWC Counterclaim-

Plaintiffs are authorized to distribute the Viacom Services to TWC video subscribers via its cable

system so that subscribers can watch the Viacom Services on video display devices of their

choice, including their iPads, regardless of the transmission technology, using applications

provided by TWC.

98.    The Viacom Counterclaim-Defendants are not entitled unilaterally to alter any

terms of the Viacom Affiliation Agreements and have no basis under the Viacom Affiliation

Agreements upon which to object to subscriber use of different video display devices, such as

iPads or "Smart TV's," to view video programming distributed by TWC over its cable system.

There are no limitations under the grant of rights in the Viacom Affiliation Agreements

restricting the video display devices, whether televisions, iPads, or Smart TV's, that TWC video

subscribers may utilize to watch programming distributed over the TWC cable system.

99.    The Viacom Counterclaim-Defendants have demanded that TWC cease and desist

from the distribution of the Viacom Services through the TWCable TV iPad App, which utilizes

the same TWC cable system through which other TWC services are provided, and have brought

this action seeking damages and injunctive relief.

100.   The dispute between the parties is ripe for adjudication by way of declaratory judgment in order to establish the rights and obligations of the parties, so as to prevent harm to the TWC Counterclaim-Plaintiffs. There is no adequate alternative remedy.

### COUNT TWO

### (Declaratory Judgment – Non-Infringement of Copyrights)

101.   The TWC Counterclaim-Plaintiffs repeat and reallege the allegations in paragraphs 1 through 100, as if fully set forth herein.

102.   In the Viacom Affiliation Agreements, the Viacom Counterclaim-Defendants have granted the TWC Counterclaim-Plaintiffs a broad license to distribute the Viacom Services through TWC's cable systems.

103.   Under the Viacom Affiliation Agreements, the TWC Counterclaim-Plaintiffs are authorized to launch the TWCable TV iPad App to enable subscribers to engage in in-home iPad viewing of the Viacom Services.

104.   As a licensee acting lawfully within its rights under license agreements granted by the Viacom Counterclaim-Defendants, the TWC Counterclaim-Plaintiffs did not infringe any copyrights held by the Viacom Counterclaim-Defendants during the two-week period in which TWC enabled certain subscribers to view the Viacom Services on iPads in their homes.

105.   The dispute between the parties is ripe for adjudication by way of declaratory judgment in order to establish the rights and obligations of the parties, so as to prevent harm to the TWC Counterclaim-Plaintiffs.  There is no adequate alternative remedy.

## COUNT THREE

### (Declaratory Judgment – Suite Services Agreement, Core Services Agreement, and Comedy Agreement)

106.   The TWC Counterclaim-Plaintiffs repeat and reallege the allegations in paragraphs 1 through 105, as if fully set forth herein.

107.   If the Court accepts the Viacom Counterclaim-Defendants' allegation that the TWCable TV iPad App <u>does</u> involve distribution of the Viacom Services via the Internet or online service, then the Viacom Counterclaim-Defendants have granted an unaffiliated third party the right to exhibit or distribute the Viacom Services "via the Internet or online" within the meaning of Sections 4(g)(B) and 4(g)(C) of the Suite Services Agreement and the ADM Provisions of the Suite Services Agreement, the Core Services Agreement, and the Comedy Agreement.

108.   Under Sections 4(g)(B) and 4(g)(C) the Suite Services Agreement, the TWC Counterclaim-Plaintiffs have the right to terminate the agreement with respect to and cease distribution of *MTV2* and *VH1 Classic*.

109.   Under the ADM Provisions of the Suite Services Agreement, the Core Services Agreement, and the Comedy Agreement, for the "Service or Services with respect to which Network has granted such Excess Grant" and with respect to the "portion of the Service such Third Party is licensed to distribute," the TWC Counterclaim-Plaintiffs are entitled to either (i) termination of those agreements, or (ii) identical Internet distribution rights "in lieu of" the existing grant of cable distribution rights.

110.   The Viacom Counterclaim-Defendants refuse to recognize the TWC Counterclaim-Plaintiffs' rights under Sections 4(g)(B) and 4(g)(C) of the Suite Services

Agreement and the ADM Provisions of the Suite Services Agreement, the Core Services Agreement, and the Comedy Agreement.

111.    The Viacom Counterclaim-Defendants have failed to offer the TWC Counterclaim-Plaintiffs identical Internet distribution rights or the option to terminate the Suite Services Agreement, the Core Services Agreement, and the Comedy Agreement with respect to impacted services.

112.    The dispute between the parties is ripe for adjudication by way of declaratory judgment in order to establish the rights and obligations of the parties, so as to prevent harm to the TWC Counterclaim-Plaintiffs.  There is no adequate alternative remedy.

### COUNT FOUR

**(Breach of Contract – Suite Services Agreement,
Core Services Agreement, and Comedy Agreement)**

113.    The TWC Counterclaim-Plaintiffs repeat and reallege the allegations in paragraphs 1 through 112, as if fully set forth herein.

114.    If the Court accepts the Viacom Counterclaim-Defendants' allegation that the TWCable TV iPad App does involve distribution of the Viacom Services via the Internet or online service outside the scope of the TWC Counterclaim-Plaintiffs' existing distribution rights, then the Viacom Counterclaim-Defendants have granted an unaffiliated third party the right to exhibit or distribute the Viacom Services "via the Internet or online" within the meaning of the ADM Provisions the Suite Services Agreement, the Core Services Agreement, and the Comedy Agreement.

115.    Under the ADM Provisions of the Suite Services Agreement, the Core Services Agreement, and the Comedy Agreement, for the "Service or Services with respect to which Network has granted such Excess Grant" and with respect to the "portion of the Service such

57

Third Party is licensed to distribute," the TWC Counterclaim-Plaintiffs are entitled to either (i) termination of those agreements, or (ii) identical Internet distribution rights "in lieu of" the existing grant of cable distribution rights.

116.   The Viacom Counterclaim-Defendants have breached their obligations under the ADM Provisions of the Suite Services Agreement, the Core Services Agreement, and the Comedy Agreement by failing to offer the TWC Counterclaim-Plaintiffs identical Internet distribution rights or the option to terminate the Core Services Agreement and the Comedy Agreement with respect to impacted services.

117.   As a result of the Viacom Counterclaim-Defendants' breach of the Suite Services Agreement, the Core Services Agreement, and the Comedy Agreement, the TWC Counterclaim-Plaintiffs have been immediately injured and such injury is ongoing, in an amount to be proven at trial.

## COUNT FIVE

### (Breach of Contract, CMT Agreement)

118.   The TWC Counterclaim-Plaintiffs repeat and reallege the allegations in paragraphs 1 through 117, as if fully set forth herein.

### *Content Obligations in the CMT Agreement*

119.   The bedrock of the cable television service offered to consumers by TWC, and a key to its competitive position, is the selection of an appealing programming mix.  TWC carefully ensures that it delivers not only the most popular, quality programs, but also that it carries "something for everyone" — recognizing its customers' broad array of interests.

120.   Thus, before agreeing to carry a new service, TWC generally considers how the programming on that service will fit within TWC's overall slate of programming, or serves a desired need or demographic.  In order to protect its editorial right and competitive need to

ensure a suitable and diverse mix of programming, TWC typically includes protective content clauses in its agreements to ensure a degree of certainty and predictability in the mix of its offerings.

121.    Accordingly, the CMT Agreement included such a material term providing that CMT " ███████████████████████████████████████████████

███████████████████████████████████████ " CMT Agreement § 6(b)

(Jan. 1, 1999) (hereinafter referred to as the "1999 Content Clause"). To provide even more clarity as to what constitutes country music programming, the CMT Agreement provided a schedule of representative programming and specified that CMT's programming line-up " ████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████ " CMT Agreement § 6(b) and Exhibit C (Jan.

1. 1999) (hereinafter referred to as the "1999 Programming Grid").

122.    The 1999 Content Clause was then amended in 2004, altering the language and incorporating a new representative programming lineup — *i.e.*, the "2004 Programming Grid" — the effect of the provision was, and to this day continues to be, the same. It provides:



(First Amendment Core Services Agreement § 15 (Nov. 9, 2004) (hereinafter referred to as the "2004 Content Clause" and the "2004 Programming Grid") (emphasis added).

123.    Section 13 of the 1999 CMT Agreement, titled "Termination and Service Mergers," which was undisturbed by the 2004 amendment and remains in full force and effect, provides:



124.    Because the 2004 Content Clause is a material term in the CMT Agreement, as amended, a breach of that clause by the CMT Counterclaim-Defendants entitles TWC to terminate the CMT Agreement.

125.    The 2004 Content Clause and accompanying 2004 Programming Grid are important because they provide not just the titles of representative programs, but also the time and frequency of such programming. For example, the 2004 Programming Grid reflects that CMT provided several hours of paid programming, but the paid-programming was aired in the less popular overnight hours. TWC would not have entered into an agreement with CMT if CMT were permitted to provide such paid-programming regularly during prime-time hours. That is why TWC chose to incorporate a representative programming grid, rather than simply specify titles of the type of programs that would be provided on the network.

126.    TWC has fully performed its obligations under the CMT Agreement, as amended.

### Breach of the 2004 Content Clause

127.    Over the last year and a half, CMT has heralded its increasing deviation from the 2004 Programming Grid and its breach of the 2004 Content Clause. For example, in a May 19, 2010, Press Release titled "CMT's Brad Johnson Takes On Additional Duties Overseeing All Series Development for Network," CMT announced that it would begin development of a new category of television series, including "comedy, scripted, reality and game shows."

128.   Subsequently, in a February 2, 2011 press release, CMT announced that it had hired a new Executive Vice President to "oversee all development for the channel and manage the network's development team." The press release stated that CMT's new hire was "a production-savvy executive with a deep background in hit reality," that he "enjoys a terrific reputation within the LA community" and would "shine a bright light on CMT's aggressive Development agenda." The same press release further stated that under the leadership of this new executive, CMT would be "pushing in new directions that will expand programming in surprising ways" and "take CMT on a wild ride."

129.   Subsequently, on March 15, 2011, CMT announced the creation of a new division for original movies in a Press Release titled "CMT Announces Newly-Created Television Movie Division 'CMT Original Movies.'"

130.   Then, on August 22, 2011, CMT announced that it had hired Eliot Goldberg, with Jayson Dinsmore quoted as remarking that "I'm thrilled to welcome Eliot to CMT as we continue to take huge, aggressive strides in our original programming development."

### Analysis of CMT's Radical Transformation

131.   A detailed comparison of the 2004 Programming Grid versus CMT's current programming demonstrates that the network has indeed undergone a dramatic makeover, just as CMT's press releases had indicated.

132.   Specifically, in the 2004 time period referenced in the CMT Agreement, as reflected in the 2004 Programming Grid, more than 65% of all programming on CMT consisted of live country music performances, country music videos, or profiles of country music artists. By contrast, during the same time period in 2011 less than 35% of programming on CMT consisted of such programming.

133.   The contrast is even starker during critical prime time hours.  In the relevant 2004 time period, country music performances and country music videos accounted for more than 40% of prime time programming, and profiles of country music artists accounted for 19% of prime time programming, for a total of approximately 60%.  In contrast, during the same time period in 2011, country music performances, country music videos, or profiles of country music artists have together accounted for *less than 1%* of prime-time programming.

134.   A further analysis of CMT's current programming grids demonstrates that the country music-related programming that had been aired on CMT in the 2004 period has been replaced *almost entirely* by movies and television series, which for the most part bear no relationship to country music.  Such programming, which in 2011 constitutes over 90% of prime time programming on CMT, includes re-runs of reality shows such as *Married . . . With Children*, and *Green Acres*, as well as hundreds of hours of *Extreme Makeover: Home Edition* and *Are You Smarter Than A 5th Grader?*, and movies including more than 75 hours of *Grumpy Old Men* and *Grumpier Old Men*, as well numerous repeat showings of movies such as *Ace Ventura Pet Detective* (a 1994 comedy starring Jim Carrey) and *True Lies* (a 1994 film starring Arnold Schwarzenegger).

135.   While CMT has touted its original (non-country music) programming development, another critical change in CMT's programming is the increasing use of programming from other networks, again, particularly during prime time hours.  In the 2004 Programming Grid, only one program aired during prime time (accounting for *less than 1%* of programming) that originated on another television network.  During the same period in 2011, approximately *twenty percent* of the prime time programming on CMT was repurposed from other networks.  Factoring in feature films (which are generally not original to CMT), the

amount of prime-time programming that was original to CMT during the relevant 2004 period was still over 85%. That ratio of original prime time programming was almost completely reversed during the same period in 2011, when repurposed programming (including movies) accounted for approximately 74% of prime-time programming.

136.   TWC sent Viacom a Notice of Material Breach of the CMT Agreement on April 11, 2011. However, as a show of good faith at a subsequent meeting, TWC agreed not to cease carrying CMT programming immediately, nor without providing CMT another 30 days notice prior to termination. Since then, the CMT Counterclaim-Defendants have failed to cure.[1]

137.   CMT's upcoming Fall 2011 lineup will continue to deviate from the country music that dominated the 2004 Programming Grid. In a September 6, 2011 press release, CMT announced October and November launches of multiple new reality-television series — including *Top Secret Recipe*, *Trick My What?*, and *Dallas Cowboys Cheerleaders: Making the Team* — and the premiere of its made-for-TV movie: *Reel Love*. All of these programs are departures from the country music-focused programming that TWC contracted to receive.

138.   The radical transformation of CMT from a country music-related network to a home for reality shows, movies, and repurposed programs has fundamentally altered the programming mix on TWC cable systems and caused considerable harm to TWC, which has already negotiated and paid for such programming from other networks, particularly during prime-time hours.

---

[1] Instead, on May 24, 2011, the CMT Counterclaim-Defendants filed an action against certain of the TWC Counterclaim-Plaintiffs in the District Court for the 44th Judicial District, Dallas County, Texas seeking, *inter alia* a declaratory judgment regarding TWC's carriage of CMT and specific performance of the CMT Agreement. Because Texas is not the proper forum in which to pursue the action, TWC is moving to dismiss that lawsuit.

139.    Under the terms of the CMT Agreement, the CMT Counterclaim-Defendants are obligated to deliver programming on CMT that does not materially deviate from that referenced in the 2004 Programming Grid.

140.    The programming on CMT from at least as early as the spring of 2010 and continuing through September 2011 has materially deviated from the 2004 Programming Grid, and the CMT Counterclaim-Defendants have refused to state that they will not deviate from the 2004 Programming Grid in the future.

141.    The CMT Counterclaim-Defendants' failure to deliver country music television on CMT consistent with the 2004 Programming Grid is a material breach of the CMT Agreement, as amended.

142.    As a result of CMT's transformation into a general entertainment service not focused on delivering country music-related television, particularly during prime time hours, the TWC Counterclaim-Plaintiffs have been immediately injured and such injury is ongoing, in an amount to be proven at trial.

143.    As a result of the CMT Counterclaim-Defendants' breach of their CMT Agreement, as amended, the TWC Counterclaim-Plaintiffs may terminate such agreement.


WHEREFORE, the TWC Counterclaim-Plaintiffs respectfully request that the Court:

1.    Dismiss the Complaint;

2.    Declare that, under the grant of rights in the Viacom Affiliation Agreements, the TWC Counterclaim-Plaintiffs are authorized to provide services to TWC video subscribers, including through the TWCable TV iPad App, a "Smart TV" application, and other comparable

applications and services that enable subscribers to view video programming distributed on TWC's cable systems on a video display device of their choice in the home;

    3.   Declare that the TWC Counterclaim-Plaintiffs, as licensees acting lawfully within the grant of rights under the Viacom Affiliation Agreements, are not infringing any copyrights held by the Viacom Counterclaim-Defendants, by providing services to its subscribers, including through the TWCable TV iPad App, a "Smart TV" application, and other comparable applications and services, that enable subscribers to view video programming distributed on TWC's cable system on a video display device of their choice in the home;

    4.   In the alternative, if the Court accepts Viacom's original allegation in its Complaint that the TWCable TV iPad App does involve distribution of video via the Internet or online service:

    a.)   Declare that under Sections 4(g)(B) and 4(g)(C) the Suite Services Agreement, the TWC Counterclaim-Plaintiffs have the right to terminate the agreement with respect to and cease distribution of *MTV2* and *VH1 Classic*.

    b.)   Declare that under the ADM Provisions of the Suite Services Agreement, the Core Services Agreement, and the Comedy Agreement, for the "Service or Services with respect to which Network has granted such Excess Grant" and with respect to the "portion of the Service such Third Party is licensed to distribute," the TWC Counterclaim-Plaintiffs are entitled to either (i) termination of those agreements, or (ii) identical Internet distribution rights "in lieu of" the existing grant of cable distribution rights.

    c.)   Award the TWC Counterclaim-Plaintiffs monetary damages arising out of the Viacom Counterclaim-Defendants breach of the ADM provisions of the Suite Services

Agreement, the Core Services Agreement, and the Comedy Agreement, in an amount to be proven at trial.

5.    Declare that the CMT Counterclaim-Defendants are in material breach of the 2004 Content Clause of the CMT Agreement;

6.    Award the TWC Counterclaim-Plaintiffs monetary damages arising out of the CMT Counterclaim-Defendants' breach of the 2004 Content Clause of the CMT Agreement in an amount to be proven at trial;

7.    Award the TWC Counterclaim-Plaintiffs costs, attorneys' fees, and such other and further relief as the Court may deem just and proper.

Dated:        New York, New York
              October 3, 2011

CAHILL GORDON & REINDEL LLP

By:___ s/ Brian T. Markley_____
        Jonathan D. Thier (jthier@cahill.com)
        Joel Kurtzberg (jkurtzberg@cahill.com)
        Brian T. Markley (bmarkley@cahill.com)
        Kayvan B. Sadeghi (ksadeghi@cahill.com)
        80 Pine Street
        New York, NY 10005-1702
        Telephone: (212) 701-3000
        Fax: (212) 269-5420

        *Attorneys for Defendants and Counterclaim-Plaintiffs*