**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

VIACOM INTERNATIONAL INC., MTV
NETWORKS, a division of Viacom International
Inc., COMEDY PARTNERS, BET HOLDINGS
LLC and COUNTRY MUSIC TELEVISION, INC,

        Plaintiffs,

     - against -

TIME WARNER CABLE INC., TIME WARNER
ENTERTAINMENT COMPANY L.P., and TIME
WARNER CABLE LLC,

        Defendants.

------------------------------------------------------------ x



Civil Action No.

**COMPLAINT**

11 CIV 2387



Plaintiffs Viacom International Inc., MTV Networks, Comedy Partners, BET Holdings

LLC, and Country Music Television, Inc. (collectively "Plaintiffs" or "Viacom"), by and for

their Complaint against defendants Time Warner Cable Inc., Time Warner Entertainment

Company L.P., and Time Warner Cable LLC (collectively "Defendants" or "TWC"), allege as

follows:

### NATURE OF THE ACTION

1.     Viacom brings this action for damages and to enjoin Time Warner Cable from

resuming its unlicensed distribution of Viacom's programming through TWC's broadband

service.  Viacom is committed to meeting consumer demand for wireless and broadband

delivery of its programming.  To this end, Viacom has reached reasonable agreements with

several emerging and established digital platforms so that they can stream Viacom's content and

also provide an outstanding user experience.  Viacom has made clear that it is willing to discuss

extension of similar rights to others—including TWC.  What Viacom cannot do, however, is

permit one of its contracting partners, TWC, to unilaterally change the terms of its contractual relationship.

2.     Viacom seeks injunctive relief and damages for TWC's breach of the parties' licensing and distribution agreements, TWC's acts of copyright infringement under the Copyright Act of 1976, as amended, 17 U.S.C. § 101 *et seq.*, and TWC's trademark infringement and false designation of origin under the Trademark Act of 1946, as amended, 15 U.S.C. § 1051, *et. seq.*, as well as declaratory relief under 28 U.S.C. § 2201.

3.     Viacom's claims arise out of TWC's March 15, 2011 launch of a computer application for Apple Inc.'s popular iPad tablet computer line of products (the "iPad App"). This application allowed subscribers of TWC's cable television services who also subscribe to TWC's broadband internet services to stream linear feeds of Viacom's copyrighted entertainment programming directly to iPad tablets in violation of Viacom's contractual rights that define and limit TWC's rights to distribute Viacom's programming, as well as Viacom's intellectual property and other rights. From March 15, 2011 until March 31, 2011, TWC unlawfully distributed Viacom's programming through the iPad App. During this period, TWC interrupted the distribution to the iPad App for a short period of time before resuming distribution of Viacom's content. On March 31, 2011, under threat of litigation, TWC again ceased such streaming of Viacom's programming. TWC, however, has refused to agree that it will not in the future once again resume its unlawful streaming of Viacom's programming, and has expressly taken the position that it has the rights to do so. As such, TWC could resume its unlicensed distribution of Viacom's programming to the iPad App at any time.

4.     The purpose of this action is to (i) obtain a declaratory judgment that, under the parties agreements, Viacom has not granted TWC the rights to stream Viacom content through

2

broadband to the iPad app and that doing so constitutes a material breach of the parties'

agreements, (ii) enjoin TWC from further exploiting, without authorization, Viacom's rights in

its prized copyrighted entertainment programming and world famous trademarks, and (iii) seek

damages for the violations that have already occurred. Specifically, Viacom seeks to

permanently enjoin TWC from further infringing Viacom's trademarks and engaging in the

unauthorized distribution of Viacom's copyrighted entertainment programming to portable

devices via broadband by way of the iPad App or other devices.

     5.      As a leading provider of entertainment programming, Viacom has had a long-

standing distribution relationship with TWC, a leading cable television provider. TWC offers its

customers three subscription services, two of which are relevant here — video (cable television)

and high-speed data (broadband internet service). TWC customers pay monthly fees for each of

the services to which they subscribe. Viacom's agreements with TWC concern only TWC's

distribution of Viacom programming to TWC's cable television subscribers, and do not grant

TWC the right to distribute such programming to TWC's broadband subscribers. Nevertheless,

from March 15-31, 2011, TWC distributed Viacom programming to its broadband subscribers

for viewing on iPads and will not agree not to do so in the future.

     6.      The parties' business relationship has been memorialized in a series of written

agreements and amendments that define the parties' respective rights and obligations. Absent

from these agreements is any grant of rights that allows TWC to stream Viacom's entertainment

programming to iPad tablets or other similar portable devices via broadband, and Viacom has not

otherwise authorized TWC to engage in such distribution.

     7.      Viacom, upon learning of the development of the iPad App, immediately

contacted TWC to voice its concerns and objections to the broadband distribution of its

entertainment programming via the iPad App. The parties entered into discussions and exchanged correspondence, and Viacom was informed at a meeting at TWC's offices on March 8, 2011, that TWC anticipated launching the iPad App at the end of March 2011. However, on the evening of March 14, 2011, a Senior Vice President of Content Distribution & Marketing for MTV Networks received a call from a Vice President of Corporate Programming at TWC, informing her that TWC had decided to accelerate the launch date of the iPad App to the following day and that Viacom's programming services would be included. TWC was again told that it did not have the right to distribute Viacom programming via the iPad App.

8.      Nevertheless, on March 15, 2011, TWC launched the iPad App nationwide and accompanied the launch with substantial advertising and promotion that was clearly being planned for a significant period of time.

9.      Upon information and belief, it is TWC's position that the distribution of Viacom's entertainment programming to TWC broadband subscribers via the iPad App is authorized under the parties' cable distribution agreements because an iPad is no different than a television. This position ignores that TWC has not obtained rights to deliver Viacom's programming via broadband, and that the parties' agreements and course of dealing make clear that Viacom has granted TWC the rights to distribute its programming only via cable. Moreover, the grant of rights restricts TWC to distribution through services regulated under Title VI of the Communications Act, and its iPad App fails to comply with Title VI. Among other things, the programming content distributed via the TWC iPad App fails to provide parental control/blocking capabilities or emergency alerts — both of which cable operators are required to provide under Title VI.

4

10. Unless enjoined by this Court, if TWC resumes its unlawful distribution of Viacom's content, then the iPad App will result in substantial and irreparable injury to Viacom that is not fully compensable in money damages. Among other things, TWC's actions will and already have interfered with Viacom's opportunities to license content to third-party broadband providers and to successfully distribute programming on its own broadband delivery sites. Viacom also will be deprived of control over the broadband distribution of its video programming signals, copyrighted programming and related trademarks, opportunities to license content over new media, the ability to track viewership of its entertainment programming by TWC iPad App users, and the ability to ensure the quality of the signal relaying its entertainment programming to users of the iPad App.

11. Accordingly, Viacom asks that the Court permanently enjoin TWC's unlawful conduct and award Viacom damages arising out of TWC's unlawful conduct.

## JURISDICTION AND VENUE

12. This Court has exclusive subject matter jurisdiction over Viacom's claims under the Copyright Act pursuant to 28 U.S.C. §§ 1331 and 1338(a)

13. This Court has original subject matter jurisdiction over Viacom's claims under the Lanham Act pursuant to 15 U.S.C. § 1121.

14. This Court has supplemental subject matter jurisdiction over Viacom's claims under the common law of the State of New York pursuant to 28 U.S.C. § 1367, as such claims are substantially related to Viacom's federal copyright and trademark claims.

15. This Court has personal jurisdiction over TWC. TWC does continuous and systematic business in New York and this District, maintains its corporate offices and employs personnel in New York and this District, and is thus physically present in the state. *See* N.Y.

5

C.P.L.R. § 301. TWC has also transacted business within New York and contracted to supply goods or services in New York in connection with the matters giving rise to this suit. *See id.* § 302(a)(1). TWC has also committed infringing acts outside of New York causing injury to Viacom in New York, and TWC regularly does or solicits business in New York, and/or derives substantial revenue from goods used or services rendered in New York, and/or expect or reasonably should expect their infringing conduct to have consequences in New York and derive substantial revenue from interstate commerce. *See id.* § 302(a)(3). In addition, plaintiffs Viacom International Inc. and Comedy Partners have their respective principal places of business in New York and in this District, and have been injured in New York by TWC's infringing conduct.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c) and 1400(a).

## THE PARTIES

17.     Plaintiff Viacom International Inc. ("Viacom International"), one of the world's leading creators of programming and content across all media platforms, is a Delaware corporation with its principal place of business in New York, New York.

18.     Plaintiff MTV Networks is a division of Viacom International.

19.     Plaintiff Comedy Partners, a subsidiary of Viacom International, is a general partnership formed in New York with its principal place of business in New York, New York.

20.     Plaintiff BET Holdings LLC, a subsidiary of Viacom Inc. (the parent of Viacom International), and parent of Black Entertainment Television, Inc. (and its successor Black Entertainment Television, LLC), is a limited liability company formed in Delaware with its principal place of business in the District of Columbia.

21.     Plaintiff Country Music Television, Inc., a subsidiary of Viacom Inc., is a Tennessee corporation with its principal place of business in Nashville, Tennessee.

22.     Upon information and belief, defendant Time Warner Cable Inc. is a Delaware corporation with its principal place of business in New York, New York.

23.     Upon information and belief, defendant Time Warner Entertainment Company L.P. is a Delaware limited partnership with its principal place of business in New York, New York.

24.     Upon information and belief, defendant Time Warner Cable LLC is a limited liability corporation formed in Delaware, with its principal place of business in New York, New York.

## FACTS

### Plaintiffs' Businesses

25.     Viacom is among the world's leading creators, producers and distributors of copyrighted television programming and other entertainment programming, all of which are marketed and promoted under Viacom's world famous trademarks. Viacom has invested and continues to invest many millions of dollars annually to create and disseminate its entertainment programming to the millions upon millions of consumers who desire to experience the original works it creates. Viacom's economic incentive to continue to invest substantial amounts of money is protected by contractual arrangements which confer defined and limited rights on authorized distributors and also is furthered by the protections afforded by the copyright and trademark laws.

26.     Viacom provides its entertainment programming across a variety of platforms, including television, motion pictures and digital media, through many of the world's best known

entertainment brands. Viacom's entertainment programming, which is marketed and promoted under some of the most recognizable trademarks in the world, reaches over 578 million households worldwide via its approximately 165 channels and multiplatform properties, which include MTV, MTV2, mtvU, MTV Tr3s, VH1, VH1 Classic, CMT, Logo, Nickelodeon/Nick at Nite, Nick Jr. (formerly, Noggin), Teen Nick (formerly, The N), Nicktoons Networks, BET, Comedy Central, Spike TV, and TV Land, among others.

27.     Viacom distributes and publicly performs its entertainment programming, and/or licenses the distribution and/or public performance of such works, by telecast on cable and satellite television systems, through its own internet websites, such as www.comedycentral.com and www.mtv.com, and various authorized internet distribution channels, such as Hulu and Netflix, and over cell phones and other portable devices, among other ways.

28.     Examples of authorized broadband distribution of Viacom's entertainment programming include Apple's iTunes Music Store, which sells secure digital downloads of television shows from several of Viacom's television networks and streaming services such as Hulu and Netflix. The programming distributed through these licensed on-line broadband distribution channels include "The Daily Show with Jon Stewart," "The Colbert Report," and "South Park" from Comedy Central; "SpongeBob SquarePants," and "Dora the Explorer," among others, from Nickelodeon; and "Beavis and Butthead" and "Laguna Beach," among others, from MTV.

29.     Viacom's ability to create the cable television programming its audiences love is dependent on two principal revenue streams that form its core business model: (i) "affiliation fees" or other consideration from cable, satellite and telephone companies who sell television programming services directly to consumers and (ii) advertising sold to national accounts.

Viacom's principal revenue source, however, in its largest sector — cable networks — is advertising sales. Many of the world's leading consumer product and/or service companies advertise on Viacom's television networks and internet websites, including Proctor & Gamble, Coca Cola, and General Motors.

30.     The income Viacom generates through the sale of most of its advertising is largely dependent on the number of viewers of its entertainment programming as recorded by the industry-standard audience measurement service, Nielsen Media Research ("Nielsen"). Using electronic monitoring technology, Nielsen provides advertisers with information regarding the viewership volume and demographics of particular television programs. As is well understood in the media industry, this information plays an integral role in the determination of the value of advertising space on Viacom's television networks.

31.     Viacom generally negotiates the rates for advertising time with national advertisers on a "CPM" or cost per thousand viewers basis. Therefore, the rates for these advertisements depend largely on the projected audience size, which in some cases Viacom guarantees to its advertisers. In order to estimate audience size and measure its delivery of the guaranteed audience size, Viacom and the companies wishing to purchase advertising time rely heavily on the Nielsen ratings. Indeed, Nielsen reports that "[i]n the United States … broadcasters and cable networks use our television audience ratings as the primary currency to establish the value of their airtime. . . . Advertisers use this information to plan television advertising campaigns, evaluate the effectiveness of their commercial messages and negotiate advertising rates." Nielsen 2010 Annual Report.

32.     In addition to the use of ratings to set base advertising rates, cable television advertising deals often also include guarantees to the advertiser that a certain audience size

9

(measured by ratings) will be delivered for a program in which the advertiser's commercial will run. If the programming under-delivers in ratings, Viacom pays a penalty to the advertiser in the form of reimbursement for a portion of the price paid for an advertisement or free future advertising time known as "make-goods" or audience deficiency units.

33.     The Nielsen ratings are also the key metric that Viacom uses in making decisions about its programming. The daily Nielsen reports sent to Viacom set forth not only how many people watch each program, but also who watches each program (i.e., teenage girls, 18-24 year old men, etc.). Viacom bases its decisions about whether to continue programs or stop making new episodes on the audience size metric provided by Nielsen. Viacom also relies on the Nielsen ratings to make scheduling decisions. For example, if the Nielsen ratings show that the viewers of a certain program are mostly female, Viacom may use that information to schedule another program viewed primarily by females in the following time slot.

34.     Upon information and belief, Nielsen does not currently measure the broadband streaming of television programming on portable devices, such as iPad tablets, and will not be in a position to do so for a substantial period of time.

**Defendants' Businesses**

35.     TWC offers three subscription services to its customers (i) video, (ii) high-speed data, and (iii) voice. TWC's video (cable television) and high-speed data (broadband internet) services are sold separately to subscribers and are described as separate services on TWC's website and in TWC's 2010 Annual Report comprising different categories of income.

36.     TWC's 2010 Annual Report states that TWC's 12.3 million residential cable television subscribers pay a fixed monthly fee for video services that include On-Demand, high-definition and digital video recorder services.

10

37.     On the other hand, TWC's 2010 Annual Report states that TWC's 9.5 million residential broadband customers pay a monthly fee for a connection to the internet. The monthly fee charged to TWC's broadband customers is entirely distinct from the fee paid by TWC's cable television subscribers for television content.

## The Agreements Between Viacom and TWC

38.     Viacom and TWC have had a long-standing relationship whereby Viacom non-exclusively licenses its entertainment programming content to TWC for distribution to its cable subscribers in exchange for monthly licensing fees based on the number of subscribers. This relationship has been memorialized in a series of written agreements entered into by the parties.

39.     TWC's broadband distribution of Viacom's entertainment programming through the TWC iPad App is not authorized in the parties' agreements or elsewhere and thus exceeds the scope of the distribution rights granted thereunder.

### *The Core Agreement*

40.     On August 10, 2000, MTV Networks ("MTVN") and TWC entered into an affiliation agreement (the "Core Agreement"), in which MTVN granted TWC the rights to distribute "via cable" certain television programming to TWC's cable subscribers:

> **Grant of Rights**. During the term of this Agreement, [MTVN] hereby grants to [TWC], and [TWC] hereby accepts from [MTVN], the non-exclusive right, and to the extent set forth herein, the obligation, for Time Warner Cable Systems to exhibit and distribute the Services in an analog format…to any person in an Operating Area….

Core Agreement, Section 2(a) (emphasis added). "Time Warner Cable Systems" is defined in the Core Agreement as follows:

> each cable television system located in the Territory providing cable television program services to consumers via cable, pursuant to Title VI, and as defined in Section 602(7), of the Communications Act of 1934, as amended, a satellite master antenna television system ('SMATV'), a multichannel multipoint distribution service ('MMDS'), or a microwave distribution service ('MDS')….

11

Core Agreement, Section 1(a) (emphasis added).

41.     The Core Agreement further provides that TWC may only receive the signal feed

carrying the licensed programming by MTVN Satellite or through a third-party authorized by

MTVN, and TWC may not re-transmit that signal via satellite or microwave or other wireless

transmission method.  Core Agreement, Section 5(a).

42.     MTVN's grant of cable rights to TWC has never been amended to allow TWC to

retransmit programming to TWC subscribers by broadband to portable electronic devices such as

an iPad.

43.     Additionally, the Core Agreement prohibits TWC, in transmitting the signal for

the MTVN channels to subscribers, from "materially degrad[ing], or materially and adversely

perceptually interfer[ing] with, the principal picture quality or the audio quality of any of the

Services' signal from a reasonable viewer's perspective."  Core Agreement, Section 4(c).

44.     These provisions clearly show that MTVN has granted TWC the right to

distribute programming, via cable, to TWC's customers who subscribe to cable television

services and not over any other services TWC provides, such as broadband.  This agreement has

never been modified to permit TWC to distribute MTVN's entertainment programming via

broadband to portable electronic devices such as iPads.  This central facet of the contractual

relationship among the parties has never been amended.  And it cannot be implied by anything

else not the least because the Reservation of Rights Clause in the governing Core Agreement

still in effect  says "[TWC] shall not use, or authorize the use of or cause the use of, any of the

Services in any manner unless **expressly** authorized by the terms and conditions of this

Agreement."  Core Agreement, Section 5(h)(vi) (emphasis added).

45.     The Reservation of Rights Clause in the Core Agreement is a material term. Like TWC's new broadband service, each new form of distribution raises a variety of issues, both technical and marketplace, and MTVN has reserved for itself the ability to evaluate changing circumstances prior to making a grant of rights to TWC.

**The Comedy Central Agreement**

46.     On April 23, 2003, MTVN and Comedy Partners entered into a separate agreement with TWC for distribution rights for Comedy Central (the "Comedy Central Agreement").

47.     The Comedy Central Agreement, like the Core Agreement, limits TWC's distribution right to cable television systems, satellite master antenna television systems ("SMATV"), multipoint distribution services ("MDS"), and mulitchannel multipoint distribution services ("MMDS"). Comedy Central Agreement, Section 1(a).

48.     The Comedy Central Agreement contains the same prohibition on retransmission of the signal, the same prohibition on degrading or interfering with the principal picture quality or the audio quality when transmitting the signal, and the same reservation of rights provision contained in the Core Agreement.

49.     The Comedy Central Agreement has never been modified to permit TWC to distribute Comedy Central's content to portable electronic devices such as iPads.

**The Legacy Agreements**

50.     Over the years, TWC also entered into agreements with then-unaffiliated cable television programming providers Country Music Television, Inc. (the "CMT Agreement") and Black Entertainment Television, Inc. (the "BET Agreement") (collectively the "Legacy Agreements"). The unaffiliated cable television programming providers were later acquired by

Viacom International, and the Legacy Agreements were collectively amended through
subsequent agreements between Viacom and TWC.

51.     None of the Legacy Agreements expands TWC's grant of rights to authorize the
broadband distribution of Viacom's entertainment programming to portable electronic devices
such as iPads.

52.     Furthermore, the Legacy Agreements, like the Core Agreement and the Comedy
Central Agreement, forbid TWC from reproducing the programming covered by those
agreements without prior written authorization. The Legacy Agreements also forbid TWC from
materially degrading or interfering with BET or CMT's signal when distributing the BET and
CMT channels to subscribers.

53.     The Core Agreement, the Comedy Central Agreement and the Legacy
Agreements are hereinafter referred to collectively as the ("Agreements").

**Subsequent Amendments to the Agreements**

54.     Subsequent to entering into the Agreements, prior to the launch of the iPad App,
and consistent with the limited nature of the rights grants, whenever TWC sought to expand the
scope of its rights to distribute Viacom programming via cable television services under the
Agreements, including to accommodate new technology, TWC and Viacom negotiated and
entered into a signed written amendment to the Agreements, or a separate agreement. By way of
example, the parties have negotiated for TWC to provide "Start Over" technology to subscribers
viewing licensed Viacom programming on cable television. Start Over technology allows
viewers to restart a program that is in progress at any time while the program is airing. Among
other things, TWC also negotiated for the right to offer Viacom programming on its video on
demand platform. TWC also negotiated the right to distribute the high definition feeds of

specific Viacom programming services (the "HD Feeds") to its cable subscribers. The HD Feeds have been converted by Viacom to a high definition format which materially enhances picture quality. Viacom received additional consideration from TWC for each additional right granted under the amendments.

55. Each time TWC's rights to distribute Viacom programming to its cable subscribers were changed or expanded, the new distribution and licensing rights were fully and specifically defined by the parties. Moreover, with one very narrow exception discussed below, each amendment involved a change to its licensing and distribution rights within the cable television services TWC provided to its cable television subscribers, not an extension of rights to distribute Viacom's programming by broadband.

56. The only time the parties contemplated any broadband services in the Agreements, the broadband rights were limited to distributing broadband content (as opposed to cable television content) via TWC's broadband services. Even in this limited circumstance, Viacom ensured that the right was extremely narrow and was limited to three specific offerings:

> MTVN shall grant to TWC the right to distribute, and allow its cable operator affiliates to distribute, via TWC's high speed broadband service as described in Section 3(n)(iii) of this Second Amendment, NickArcade (access to downloadable paid games), Urge Digital Music Service (provided such service is owned and operated by MTVN), and MyNoggin (broadband pre-school edutainment service) as described in the July 26, 2006 presentation made by MTVN to TWC (the "MTVN Broadband Content") under the most favorable terms and conditions that are applicable to any individual third party distributor of the MTVN Broadband Content, subject to TWC's agreement to comply with any terms and conditions directly related to distribution of the MTVN Broadband Content with which such other individual third party distributor is required to comply in order to obtain such favorable terms and conditions.

Second Amendment to the Agreements, Section 10(e).

57. Viacom has never granted any expansive broadband wireless distribution rights to TWC.

15

58.     Indeed, in 2004, when Viacom and TWC agreed to launch co-branded websites displaying some of Viacom's content, TWC's role was explicitly limited to including its brand on websites exclusively controlled by Viacom. The relevant contract provision states that Viacom (and not TWC) had the right to "develop, host and provide content for the co-branded microsite(s)" and that Viacom "maintain[ed] creative control over the content, design and format of the co-branded microsites which may include such elements as links, text, multimedia, streaming video and associated icons and/or graphics." Thus, far from granting TWC rights to distribute Viacom content via its broadband service, Viacom agreed only to allow TWC to include its name on a website controlled by Viacom.

59.     Now, contrary to the prior course of conduct between the parties, and despite the fact that TWC's distribution of the Viacom programming to iPads is far more expansive than any distribution rights TWC has negotiated for in the past, TWC, instead of negotiating with Viacom for such rights, simply launched the iPad App with Viacom content, and made it available to TWC's broadband customers.

**Viacom's Intellectual Property**

60.     Among Viacom's most important assets are the intellectual property rights that it owns and licenses in connection with its original entertainment programming.

*The Viacom Copyrights*

61.     Viacom is the legal or beneficial owner of the copyrights in numerous programs that have been, or will be, exhibited over cable television and a variety of other media outlets. A non-exhaustive list of such television programs, identifying representative examples of programs in which Viacom (and/or its subsidiaries or affiliates) own the pertinent copyright interests (the "Copyrighted Programs"), is set forth in Exhibit A attached hereto.

62. Each such Copyrighted Program is an original audiovisual work that has been or will be fixed in a tangible medium of expression and constitutes copyrightable subject matter within the meaning of Section 102 of the Copyright Act, 17 U.S.C. § 102. In addition, each such Copyrighted Program has been or will be registered with the United States Copyright Office or is the subject of an application for registration filed with the Copyright Office. Representative examples of the copyright registration certificates or other documentation demonstrating compliance with Sections 408(f) and 411 of the Copyright Act, 17 U.S.C. §§ 408(f) & 411, and implementing Copyright Office regulations, corresponding to the Copyrighted Programs identified in Exhibit A, are attached hereto as Exhibit B.

63. Under Section 106 of the Copyright Act, 17 U.S.C. § 106, Viacom owns the exclusive rights, among others, to reproduce and copy its copyrighted works, to distribute copies to the public of its copyrighted works, to publicly perform its copyrighted works, to publicly display its copyrighted works, and to make derivative works based upon its copyrighted works.

64. Except as explicitly authorized in the parties' Agreements, neither Viacom nor any other person authorized by Viacom has granted any license, permission or authorization to TWC to exercise any of the rights set forth above or to authorize others to exercise such rights, with respect to the Copyrighted Programs or any other works in which Viacom (and/or its subsidiaries or affiliates) own copyrights.

65. The agreements do not authorize TWC's broadband distribution of Viacom's entertainment programming, including ,without limitation, the Copyrighted Programs, to portable electronic devices, such as iPads.

*The Viacom Trademarks*

66.    Viacom is the legal or beneficial owner of numerous trade and service marks that it uses on and in connection with a wide variety of services and goods, including, but not limited to, entertainment programming and various consumer products, as well as the marketing and promotion of such services and goods, in interstate commerce throughout the United States and the world.

67.    Among the trade and service marks owned and used by Viacom, are the following which are the subject of registrations on the Principal Register of the United States Patent and Trademark Office:

| Registration No. | Mark | Registered Owner | Registration Date | Int. Cl. |
|---|---|---|---|---|
| 1,580,650 |  MTV MUSIC TELEVISION | Viacom | January 30, 1990 | 41 |
| 1,818,179 | MTV MUSIC TELEVISION | Viacom | January 25, 1994 | 38, 41 |
| 3,901,512 | nick | Viacom | January 4, 2011 | 38 |
| 3,908,810 | nick | Viacom | January 18, 2011 | 41 |
| 1,390,284 | NICK | Viacom | April 15, 1986 | 41 |
| 1,745,015 | COMEDY CENTRAL | Comedy Partners | January 5, 1993 | 38, 41 |
| 2,533,788 | COMEDY CENTRAL | Comedy Partners | January 29, 2002 | 38, 41 |
| 3,082,867 | BET★ | Black Entertainment Television, LLC | April 18, 2006 | 41 |

| Registration No. | Mark | Registered Owner | Registration Date | Int. Cl. |
|---|---|---|---|---|
| 2,933,024 | BET JAZZ | Black Entertainment Television, LLC | March 15, 2005 | 41 |
| 3,500,146 | BETJ | Black Entertainment Television, LLC | September 9, 2008 | 38, 41 |
| 2,902,191 | CMT | Country Music Television, Inc. | November 9, 2004 | 41 |
| 3,931,830 | GET COUNTRY | Country Music Television, Inc. | March 15, 2011 | 41 |
| 3,740,085 | CMT CROSSROADS | Country Music Television, Inc. | January 19, 2010 | 41 |

68.     The foregoing Viacom service marks (hereinafter, the "Viacom Marks") are in full force and effect, and many have achieved incontestable status pursuant to 15 U.S.C. § 1065. Copies of the registration certificates for the Viacom Marks are attached hereto as Exhibit C.

69.     In addition to being, in and of themselves, highly distinctive marks and designs, as a result of Viacom's uninterrupted and continuing use of the Viacom Marks on and in connection with a wide variety of services and goods, the Viacom Marks have acquired distinctiveness, and have developed a strong secondary meaning among consumers and the trade. Accordingly, the Viacom Marks immediately identify Viacom as the exclusive source of services and goods bearing the Viacom Marks, and signify goodwill of incalculable value.

**Defendant's Unlawful Conduct**

70.     On March 14, 2011, Viacom learned that TWC planned to launch the TWC iPad App the very next day, allowing TWC's customers who subscribe both to TWC's cable television services and to its broadband services to access Viacom's MTV, VH1, Nickelodeon, BET, CMT, Comedy Central and Spike TV video programming networks via iPad tablets.

19

71.     On March 15, 2011, TWC launched the TWC iPad App with a very well developed marketing blitz, including email "blasts" to TWC's cable and broadband subscribers, print, television and other media advertising, and even chalked advertising on sidewalks in New York City. TWC launched the iPad App with access to Viacom's content despite Viacom's express objections and the absence of any grant of rights authorizing TWC to engage in such distribution under the Agreements.

72.     On information and belief, in order to distribute content to iPads, TWC converts the signal it receives from content providers, such as Viacom, into a different format at lower bitrates (i.e., lower transmission speeds) and at reduced quality. As a result, viewers who have downloaded the iPad App (and who subscribe to both TWC's cable services and TWC's broadband services) receive two separate signals into their homes. One signal — the cable television signal — is formatted for traditional cable television and is sent to the set-top box. The other signal — the broadband signal — is formatted using internet protocol and is sent to the cable modem for transmission via wireless router to the iPad.

73.     Despite Viacom's unequivocal objection to TWC's broadband distribution of Viacom programming via the iPad App, TWC's marketing and promotional materials for the iPad App launch featured some of the most valuable and recognizable Viacom Marks. Such unauthorized use of the Viacom Marks created, and will continue to create if TWC resumes its unlicensed distribution of Viacom content, the false and misleading impression that Viacom has authorized and/or sponsored TWC's broadband distribution of Viacom programming via the iPad App.

74.     Viacom, upon receiving confirmation of the launch of the TWC iPad App, immediately wrote to TWC to demand that it cease and desist from distributing Viacom's

entertainment programming via the iPad App. TWC subsequently informed Viacom that it declined to accede to Viacom's demand and, from March 15, 2011 until March 31, 2011, TWC unlawfully distributed Viacom's programming through the iPad App. During this period, TWC interrupted the distribution to the iPad App for a short period of time before resuming distribution of Viacom's content. On March 31, 2011, under threat of litigation, TWC again ceased such streaming of Viacom's programming. TWC, however, has refused to agree that it will not in the future resume its unlawful streaming of Viacom's programming, and has taken the position that it has the rights to do so. As such, TWC could resume its unlicensed distribution of Viacom's programming to the iPad App at any time.

75.     TWC's unauthorized broadband distribution of Viacom's entertainment programming via the TWC iPad App constituted a material breach of the parties' long-standing distribution relationship and a direct infringement of the Copyrighted Programs and Viacom Marks.

**Viacom's Harm**

76.     TWC's unilateral launch of the iPad App and the unauthorized broadband distribution of Viacom's content caused Viacom significant harm and, if TWC resumes its unlawful distribution of Viacom content, will continue to cause harm to Viacom, including irreparable harm not fully compensable in money damages.

77.     The unauthorized broadband distribution of Viacom programming via the iPad App has significantly harmed Viacom's ability to sell its entertainment programming to TWC, to sell its entertainment programming to third-party broadband distributors and to develop its own broadband services.

21

78.     Selling the content of its networks to broadband providers is a vital component of Viacom's future business plan. The unauthorized broadband distribution of Viacom's entertainment programming via the iPad App has seriously impacted the viability of that business potential. Third party broadband distributors have negotiated for the right to distribute Viacom's content in the broadband market, agreed to pay a significant licensing fee to Viacom and guaranteed Viacom a significant amount in advertising revenue. By distributing Viacom's content to iPads without authorization, TWC has secured a competitive advantage over these broadband distributors who negotiated in good faith. As such, TWC has compromised Viacom's ability to enter into future contracts for the right to distribute Viacom's content in the highly innovative and growing broadband market.

79.     Furthermore, upon information and belief, the iPad App materially degrades, and/or materially and adversely perceptually interferes with, the principal picture quality or the audio quality of Viacom's entertainment programming, which in turn dilutes the value of such programming and tarnishes the Viacom Marks under which these inferior services are provided to TWC's subscribers.

80.     In addition, it is unclear how TWC is securing the broadband content distributed to iPad users via the iPad App — and particularly, how it will ensure that the content is only accessed by actual TWC cable television and broadband subscribers. A lack of security in TWC's distribution of Viacom content poses risks to Viacom and further undermines Viacom's business model.

81.     Finally, as explained above, Nielsen does not track iPad viewership of entertainment programming. This is of tremendous significance because Viacom relies on the Nielsen ratings to sell its advertising time on its networks, and the greater the audience size, the

22

greater the market value of the advertising time. Any future unauthorized broadband distribution of Viacom programming via the iPad App could potentially result in a significant reduction of the trackable viewership of Viacom's entertainment programming, thereby harming Viacom's advertising-supported business model in ways which may be difficult to measure.

82. Moreover, Viacom often guarantees its advertisers an estimated minimum Nielsen viewership rating. If Nielsen subsequently reports lower viewership than that which was guaranteed, Viacom is required to reimburse the advertiser and/or provide additional advertising time, at no charge, to that advertiser. Thus, upon information and belief, any future unauthorized broadband distribution of Viacom programming via the TWC iPad App will harm Viacom's advertising revenues.

83. Viacom also relies on accurate Nielsen ratings to make important business decisions about programming. As discussed above, Viacom uses the Nielsen ratings to make key decisions about programming and scheduling. Any future undercounting of Viacom's viewers would greatly harm Viacom's ability to make crucial business decisions about its most important asset — its programs.

84. For the foregoing reasons, TWC's unauthorized broadband distribution of Viacom's entertainment programming via the iPad App constitutes, and any such distribution in the future would constitute a material breach of the parties' Agreements, and an infringement of Viacom's intellectual property rights, that have and would continue to cause immeasurable harm to Viacom.

## CLAIMS FOR RELIEF

## COUNT I
### (Declaratory Judgment)

85.     The allegations set forth in paragraphs 1 through 84 hereof are adopted and incorporated by reference as if fully set forth herein.

86.     There is an actual controversy between Viacom and TWC concerning TWC's rights under the Agreements to distribute Viacom's entertainment programming to portable devices via broadband by way of the iPad App or other devices.

87.     As set forth more fully above, Viacom's Agreements with TWC relate only to TWC's distribution of Viacom programming to TWC's cable television subscribers, and do not grant TWC the right to distribute such programming via broadband.

88.     Upon information and belief, TWC contends that the Agreements grant it the rights to distribute Viacom content via broadband to portable devices such as the iPad. Indeed, on March 31, 2011, TWC issued the following press release making clear that an actual justiciable controversy exists between the parties. In the press release TWC stated "[w]e believe we have every right to carry the programming on our iPad app" and "[w]e will pursue all of our legal rights against the programmers."

89.     Viacom is entitled to a declaration that Viacom's Agreements with TWC relate only to TWC's distribution of Viacom programming to TWC's cable television subscribers, and do not grant TWC the right to distribute such programming via broadband.

## COUNT II
### (Breach of Contract - Unauthorized Distribution of MTVN Programming)

90.     The allegations set forth in paragraphs 1 through 89 hereof are adopted and incorporated by reference as if fully set forth herein.

91.     As set forth above, TWC entered into valid and binding written agreements with MTVN, for the distribution of MTVN's entertainment programming via authorized technologies and channels of distribution.

92.     TWC has breached its agreements with MTVN by engaging in the unauthorized broadband distribution of MTVN's entertainment programming via the TWC iPad App.

93.     MTVN has fully performed its obligations under the agreements.

94.     As a result of TWC's aforesaid breach of the agreements, MTVN has been irreparably harmed and has no adequate remedy at law.

95.     In addition, MTVN has suffered monetary damages in an amount to be determined at trial.

## COUNT III
### (Breach of Contract - Unauthorized Use of the MTVN Trademarks)

96.     The allegations set forth in paragraphs 1 through 95 hereof are adopted and incorporated by reference as if fully set forth herein.

97.     As set forth above, TWC entered into valid and binding written agreements with MTVN, which expressly limit its rights to utilize the MTVN trademarks ("MTVN Marks") in routine promotional materials provided such materials "are not inaccurate or misleading and are not used for and do not imply any endorsement or sponsorship of or advertising in or for the promotion of any product or service other than the respective Service [cable television distribution]." Core Agreement, Section 8(b).

98.     TWC has breached this provision of the agreements with MTVN by using the MTVN Marks, without authorization, in connection with the commercial advertising and promotion of its unauthorized broadband distribution of MTVN's entertainment programming via the TWC iPad App.

99.     MTVN has fully performed its obligations under the agreements.

100.     As a result of TWC's aforesaid breach of the Agreements, MTVN has been irreparably harmed and has no adequate remedy at law.

101.     In addition, MTVN has suffered monetary damages in an amount to be determined at trial.

## COUNT IV
### (Breach of Contract - Materially Degrading Quality of MTVN's Programming)

102.     The allegations set forth in paragraphs 1 through 101 hereof are adopted and incorporated by reference as if fully set forth herein.

103.     As set forth above, TWC entered into valid and binding written agreements with MTVN for the distribution of MTVN's entertainment programming that prohibits TWC, in transmitting the signal for the MTVN's channels to subscribers, from "materially degrad[ing], or materially and adversely perceptually interfer[ing] with, the principal picture quality or the audio quality of any of the Services' signal from a reasonable viewer's perspective." Core Agreement, Section 4(c).

104.     TWC has breached this provision of the Core Agreement with MTVN by materially degrading, and/or materially and adversely perceptually interfering with, the principal picture quality or the audio quality of MTVN's entertainment programming in connection with its unauthorized broadband distribution of MTVN's entertainment programming via the iPad App.

105.     MTVN has fully performed its obligations under the Agreements.

106.     As a result of TWC's aforesaid breach of the Agreements, MTVN has been irreparably harmed and has no adequate remedy at law.

26

107.    In addition, MTVN has suffered monetary damages in an amount to be determined at trial.

## COUNT V
**(Breach of Contract - Unauthorized Distribution of Comedy Central Programming)**

108.    The allegations set forth in paragraphs 1 through 107 hereof are adopted and incorporated by reference as if fully set forth herein.

109.    As set forth above, TWC entered into valid and binding written agreements with Comedy Partners, for the distribution of Comedy Central's entertainment programming via authorized technologies and channels of distribution.

110.    TWC has breached its agreements with Comedy Partners by engaging in the unauthorized broadband distribution of Comedy Central's entertainment programming via the TWC iPad App.

111.    Comedy Partners has fully performed its obligations under the agreements.

112.    As a result of TWC's aforesaid breach of the agreements, Comedy Partners has been irreparably harmed and has no adequate remedy at law.

113.    In addition, Comedy Partners has suffered monetary damages in an amount to be determined at trial.

## COUNT VI
**(Breach of Contract - Unauthorized Use of the Comedy Partners Trademarks)**

114.    The allegations set forth in paragraphs 1 through 113 hereof are adopted and incorporated by reference as if fully set forth herein.

115.    As set forth above, TWC entered into valid and binding written agreements with Comedy Partners, which expressly limit its rights to utilize the Comedy Partners trademarks ("Comedy Partners Marks") in routine promotional materials provided such Marks "are not

27

inaccurate, or misleading and are not used for and do not imply any endorsement or sponsorship of or advertising in or for the promotion of any product or service other than the Service [cable television]." Comedy Central Agreement, Section 8(b).

116. TWC has breached this provision of the agreements with Comedy Partners by using the Comedy Partners Marks, without authorization, in connection with the commercial advertising and promotion of its unauthorized broadband distribution of Comedy Partner's entertainment programming via the TWC iPad App.

117. Comedy Partners has fully performed its obligations under the agreements.

118. As a result of TWC's aforesaid breach of the Agreements, Comedy Partners has been irreparably harmed and has no adequate remedy at law.

119. In addition, Comedy Partners has suffered monetary damages in an amount to be determined at trial.

## COUNT VII
### (Breach of Contract - Materially Degrading Quality of Comedy Central Programming)

120. The allegations set forth in paragraphs 1 through 119 hereof are adopted and incorporated by reference as if fully set forth herein.

121. As set forth above, TWC entered into valid and binding written agreements with Comedy Partners for the distribution of Comedy Central's entertainment programming that prohibits TWC, in transmitting the signal for the Comedy Central channels to subscribers, from "materially degrad[ing], or materially and adversely perceptually interfer[ing] with, the principal picture quality or the audio quality of any of the Service's signal from a reasonable viewer's perspective." Comedy Central Agreement, Section 4(c).

122. TWC has breached this provision of the Comedy Central Agreement by materially degrading, and/or materially and adversely perceptually interfering with, the principal

picture quality or the audio quality of Comedy Central's entertainment programming in connection with its unauthorized broadband distribution of Comedy Central's entertainment programming via the iPad App.

123.    Comedy Partners has fully performed its obligations under the Agreements.

124.    As a result of TWC's aforesaid breach of the Agreements, Comedy Partners has been irreparably harmed and has no adequate remedy at law.

125.    In addition, Comedy Partners has suffered monetary damages in an amount to be determined at trial.

**COUNT VIII**
**(Breach of Contract - Unauthorized Distribution of BET Programming)**

126.    The allegations set forth in paragraphs 1 through 125 hereof are adopted and incorporated by reference as if fully set forth herein.

127.    As set forth above, TWC entered into valid and binding written agreements with Black Entertainment Television, Inc., a subsidiary of Plaintiff BET Holdings LLC ("BET"), for the distribution of BET's entertainment programming via authorized technologies and channels of distribution.

128.    TWC has breached its agreements with BET by engaging in the unauthorized Broadband distribution of BET's entertainment programming via the TWC iPad App.

129.    BET has fully performed its obligations under the agreements.

130.    As a result of TWC's aforesaid breach of the agreements, BET has been irreparably harmed and has no adequate remedy at law.

131.    In addition, BET has suffered monetary damages in an amount to be determined at trial.

29

## COUNT IX
### (Breach of Contract - Unauthorized Use of the BET Trademarks)

132.     The allegations set forth in paragraphs 1 through 131 hereof are adopted and
incorporated by reference as if fully set forth herein.

133.     As set forth above, TWC entered into valid and binding written agreements with
BET, which expressly limit its rights to utilize the BET trademarks ("BET Marks") only in the
normal course of promoting the BET Programs for cable television.  BET Agreement, Section
4(g).

134.     TWC has breached this provision of the agreements with BET by using the BET
Marks, without authorization, in connection with the commercial advertising and promotion of
its unauthorized broadband distribution of BET's entertainment programming via the TWC iPad
App.

135.     BET has fully performed its obligations under the agreements.

136.     As a result of TWC's aforesaid breach of the BET Agreement, BET has been
irreparably harmed and has no adequate remedy at law.

137.     In addition, BET has suffered monetary damages in an amount to be determined
at trial.

## COUNT X
### (Breach of Contract - Materially Degrading Quality of BET Programming)

138.     The allegations set forth in paragraphs 1 through 137 hereof are adopted and
incorporated by reference as if fully set forth herein.

139.     As set forth above, TWC entered into valid and binding written agreements with
BET for the distribution of BET's entertainment programming that prohibits TWC, in
transmitting the signal for the BET channels to subscribers, "in any manner which degrades or

otherwise interferes with the technical quality of the BET Programs signal." BET Agreement, Section 11(g).

140. TWC has breached this provision of the BET Agreement by degrading, and/or interfering with the technical quality of the BET Programs signal in connection with its unauthorized broadband distribution of BET's entertainment programming via the iPad App.

141. BET has fully performed its obligations under the Agreements.

142. As a result of TWC's aforesaid breach of the Agreements, BET has been irreparably harmed and has no adequate remedy at law.

143. In addition, BET has suffered monetary damages in an amount to be determined at trial.

## COUNT XI
### (Breach of Contract - Unauthorized Distribution of CMT Programming)

144. The allegations set forth in paragraphs 1 through 143 hereof are adopted and incorporated by reference as if fully set forth herein.

145. As set forth above, TWC entered into valid and binding written agreements with Country Music Television, Inc. ("CMT"), for the distribution of CMT's entertainment programming via authorized technologies and channels of distribution.

146. TWC has breached its agreements with CMT by engaging in the unauthorized Broadband distribution of CMT's entertainment programming via the TWC iPad App.

147. CMT has fully performed its obligations under the agreements.

148. As a result of TWC's aforesaid breach of the agreements, CMT has been irreparably harmed and has no adequate remedy at law.

149. In addition, CMT has suffered monetary damages in an amount to be determined at trial.

## COUNT XII
### (Breach of Contract - Unauthorized Use of the CMT Trademarks)

150. The allegations set forth in paragraphs 1 through 149 hereof are adopted and incorporated by reference as if fully set forth herein.

151. As set forth above, TWC entered into valid and binding written agreements with CMT, which expressly limit its rights to utilize the CMT trademarks ("CMT Marks") "to the advertising and promotion of its carriage of the Service over the [cable television] Systems pursuant to this Agreement." CMT Agreement, Section 15(a).

152. TWC has breached this provision of the agreements with CMT by using the CMT Marks, without authorization, in connection with the commercial advertising and promotion of its unauthorized broadband distribution of CMT's entertainment programming via the TWC iPad App.

153. CMT has fully performed its obligations under the agreements.

154. As a result of TWC's aforesaid breach of the Agreements, CMT has been irreparably harmed and has no adequate remedy at law.

155. In addition, CMT has suffered monetary damages in an amount to be determined at trial.

## COUNT XIII
### (Breach of Contract - Materially Degrading Quality of CMT Programming)

156. The allegations set forth in paragraphs 1 through 155 hereof are adopted and incorporated by reference as if fully set forth herein.

157. As set forth above, TWC entered into valid and binding written agreements with CMT for the distribution of CMT's entertainment programming that prohibits TWC, in

transmitting the signal for the CMT channels to subscribers, from "materially degrad[ing] or interfer[ing] with" "the video or audio signal for the Service." CMT Agreement, Section 7(h).

158.     TWC has breached this provision of the CMT Agreement by materially degrading, and/or interfering with the video or audio signal for CMT's entertainment programming in connection with its unauthorized broadband distribution of CMT's entertainment programming via the iPad App.

159.     CMT has fully performed its obligations under the Agreements.

160.     As a result of TWC's aforesaid breach of the Agreements, CMT has been irreparably harmed and has no adequate remedy at law.

161.     In addition, CMT has suffered monetary damages in an amount to be determined at trial.

## COUNT XIV
### (Copyright Infringement – 17 U.S.C. § 501)

162.     The allegations set forth in paragraphs 1 through 161 hereof are adopted and incorporated by reference as if fully set forth herein.

163.     Viacom (and/or its subsidiaries or affiliates) is the legal or beneficial owner of the copyrights in the Copyrighted Programs, among others. For purposes of this Count XIV only, Viacom shall not include BET Holdings LLC.

164.     TWC, without the permission or consent of Viacom, and without authority, has (i) copied and purported to authorize the copy of, (ii) publicly performed and purported to authorize the public performance of, (iii) publicly displayed and purported to authorize the public display of, and/or (iv) distributed and purported to authorize the distribution of the Copyrighted Programs via the unauthorized broadband distribution of such works to portable electronic devices by means of the iPad App. TWC's conduct constituted direct infringement of Viacom's

33

exclusive rights under the Copyright Act to publicly perform, publicly display and distribute the Copyrighted Programs.

165.    TWC thereby has willfully infringed Viacom's rights in the Copyrighted Programs, and upon information and belief, may in the future continue to willfully infringe Viacom's rights in the Copyrighted Programs and to act in bad faith, unless restrained by this Court.

166.    Upon information and belief, by it acts, TWC has made and may in the future continue to make substantial profits and gains to which it is not in law or in equity entitled.

167.    As a direct and proximate result of TWC's infringement of Viacom's rights in the Copyrighted Programs, Viacom is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c).  Alternatively, at Viacom's election, pursuant to 17 U.S.C. § 504(b), Viacom shall be entitled to its actual damages plus TWC's profits from infringement, as will be proven at trial.

168.    TWC's conduct has caused and, unless enjoined by this Court, may in the future continue to cause Viacom irreparable injury, and Viacom has no adequate remedy at law.

## COUNT XV
### (Trademark Infringement – 15 U.S.C. § 1114)

169.    The allegations set forth in paragraphs 1 through 168 hereof are adopted and incorporated by reference as if fully set forth herein.

170.    As detailed above, Viacom holds valid and subsisting trademark registrations for the Viacom Marks, and has used them extensively and continuously, in interstate commerce throughout the United States.  The Viacom Marks are inherently distinctive, and have acquired secondary meaning.

171.    As set forth above, TWC entered into valid and binding written Agreements with Viacom, for the distribution of Viacom's entertainment programming via authorized technologies and channels of distribution.

172.    Pursuant to the Core Agreement, MTVN granted TWC the narrow right to utilize the Viacom Marks in promotional materials provided such materials "are not inaccurate or misleading and *are not used for* and do not imply any endorsement or sponsorship of or advertising in or for *the promotion of any product or service other than the respective Service* [television distribution via cable]." Core Agreement, Section 8(b) (emphasis added). The Comedy Central, BET and CMT Agreements contain similar provisions. Comedy Central Agreement, Section 8(b); BET Agreement, Section 4(g); CMT Agreement, Section 15(a).

173.    By its acts alleged herein, TWC used marks and in the future may use marks that are identical and/or substantially indistinguishable from the Viacom Marks to promote a service other than TWC 's cable service, and have infringed, and in the future may continue to infringe the Viacom Marks, in violation of 15 U.S.C. § 1114.

174.    In addition, upon information and belief, TWC's use of marks that are identical to the MTVN Marks has caused, is intended to cause, and is likely to continue to cause confusion, mistake and deception among the general consuming public and the trade as to Viacom's affiliation, sponsorship or endorsement of the TWC iPad App and the broadband distribution of Viacom's programming via the TWC iPad App.

175.    Upon information and belief, TWC has acted with knowledge of Viacom's ownership of the Viacom Marks, knowledge of its lack of authorization to utilize the Viacom Marks in connection with the iPad App and the inferior services provided thereby, and with the

deliberate intention to unfairly benefit from the incalculable goodwill symbolized by the Viacom Marks.

176.     TWC's acts constituted willful trademark infringement in violation of 15 U.S.C. § 1114.

177.     Upon information and belief, by its actions, TWC intends to continue its infringing conduct, and to willfully infringe the Viacom Marks, unless restrained by this Court.

178.     Upon information and belief, by its willful acts, TWC has made and in the future may continue to make substantial profits and gains to which it is not in law or equity entitled.

179.     TWC's acts have damaged and may in the future continue to irreparably damage Viacom, and Viacom has no adequate remedy at law.

## COUNT XVI
### (False Designation of Origin – 15 U.S.C. § 1125)

180.     The allegations set forth in paragraphs 1 through 179 hereof are adopted and incorporated by reference as if fully set forth herein.

181.     The Viacom Marks are inherently distinctive and have acquired strong secondary meaning in the marketplace and immediately indicate Viacom as the exclusive source of services and products they are used in connection with.

182.     TWC, without authorization or approval from Viacom, has used marks that are identical to the Viacom Marks in connection with its unauthorized distribution of Viacom's programming via the TWC iPad App, and its marketing and promotion of the TWC iPad App and the services it provides.

183.     Upon information and belief, TWC's use of marks that are identical to the Viacom Marks has caused, is intended to cause, and is likely to continue to cause confusion, mistake and deception among the general consuming public and the trade as to Viacom's

affiliation, connection, association or endorsement of the iPad App and the unauthorized broadband distribution of Viacom's programming that it facilitates.

184.    Upon information and belief, TWC has acted with knowledge of TWC's ownership of the Viacom Marks, and with the deliberate intention to unfairly benefit from the incalculable goodwill symbolized by the Viacom Marks.

185.    TWC's acts constituted a false designation of origin, and false and misleading descriptions of fact, in violation of 15 U.S.C. § 1124(a).

186.    Upon information and belief, by its actions, TWC intends to continue its infringing conduct, and to willfully infringe the Viacom Marks, unless restrained by this Court.

187.    Upon information and belief, by its willful acts, TWC has made and in the future may continue to make substantial profits and gains to which it is not in law or in equity entitled.

188.    Upon information and belief, TWC's acts have caused and may in the future continue to cause irreparable harm to Viacom, and Viacom has no adequate remedy at law.

## COUNT XVII
### (Common Law Unfair Competition)

189.    The allegations set forth in paragraphs 1 through 188 hereof are adopted and incorporated by reference as if fully set forth herein.

190.    TWC's aforesaid conduct constitutes willful unfair competition in violation of the common law of the State of New York.

191.    Upon information and belief, by its actions, TWC intends to continue its unfair competition, unless restrained by this Court.

192.    Upon information and belief, by its willful acts, TWC has made and in the future may continue to make substantial profits and gains to which it is not in law or equity entitled.

37

193. Upon information and belief, TWC's acts have caused and in the future may continue to cause irreparable harm to Viacom, and Viacom has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Viacom demands judgment be entered against TWC as follows:

A. As to Count 1, declaring that Viacom's Agreements with TWC relate only to TWC's distribution of Viacom programming to TWC's cable television subscribers, and do not grant TWC the right to distribute such programming via broadband, including to portable tablets such as the iPad.

B. Finding that:

(i) as to Count 2, TWC breached the Core Agreement by engaging in the unauthorized broadband distribution of MTVN's entertainment programming via the iPad App;

(ii) as to Count 3, TWC breached the Core Agreement by using the MTVN Marks, without authorization, in connection with the commercial advertising, promotion and delivery of the iPad App; and

(iii) as to Count 4, TWC breached the Core Agreement by materially degrading, and/or materially and adversely perceptually interfering with, the principal picture quality or the audio quality of MTVN's entertainment programming via the iPad App;

(iv) as to Count 5, TWC breached the Comedy Central Agreement by engaging in the unauthorized broadband distribution of Comedy Central's entertainment programming via the iPad App;

(v) as to Count 6, TWC breached the Comedy Central Agreement by using the Comedy Partners Marks, without authorization, in connection with the commercial advertising, promotion and delivery of the iPad App; and

38

(vi)     as to Count 7, TWC breached the Comedy Central Agreement by materially degrading, and/or materially and adversely perceptually interfering with, the principal picture quality or the audio quality of Comedy Central's entertainment programming via the iPad App;

(vii)     as to Count 8, TWC breached the BET Agreement by engaging in the unauthorized broadband distribution of BET's entertainment programming via the iPad App;

(viii)     as to Count 9, TWC breached the BET Agreement by using the BET Marks, without authorization, in connection with the commercial advertising, promotion and delivery of the iPad App;

(ix)     as to Count 10, TWC breached the BET Agreement by materially degrading, and/or interfering with the technical quality of the BET Programs signal in connection with its unauthorized broadband distribution of BET's entertainment programming via the iPad App;

(x)     as to Count 11, TWC breached the CMT Agreement by engaging in the unauthorized broadband distribution of CMT's entertainment programming via the iPad App;

(xi)     as to Count 12, TWC breached the CMT Agreement by using the CMT Marks, without authorization, in connection with the commercial advertising, promotion and delivery of the iPad App;

(xii)     as to Count 13, TWC breached the CMT Agreement by materially degrading, and/or interfering with the video or audio signal for CMT's entertainment programming in connection with its unauthorized broadband distribution of CMT's entertainment programming via the iPad App;

(xiii)   as to Count 14, TWC engaged in willful copyright infringement against

Viacom in violation of the U.S. Copyright Act, 17 U.S.C. § 501;

(xiv)   as to Count 15, TWC engaged in willful trademark infringement and/or

trademark counterfeiting against Viacom in violation of the Lanham Act, 15 U.S.C. § 1114;

(xv)   as to Count 16, TWC engaged in willful acts of false designation of origin

and unfair competition against Viacom in violation of the Lanham Act, 15 U.S.C. § 1125;

(xvi)   as to Count 17, TWC engaged in acts of unfair competition against

Viacom in violation of the common law of the State of New York;

C.   Granting an injunction, pursuant to Rule 65 of the Federal Rules of Civil

Procedure; the Lanham Act, 15 U.S.C. § 1116; the U.S. Copyright Act, 17 U.S.C. § 502,

permanently restraining and enjoining TWC and all those persons or entities in active concert or

participation with them from:

(i)   copying, publicly performing, displaying and/or distributing Viacom's

entertainment programming, including, without limitation, the Copyrighted Programs, via

broadband distribution to portable electronic devices, such as iPads via the iPad App, and any

other new and/or emerging media technology platform not expressly covered by the Agreements;

and

(ii)   using the Viacom Marks or any colorable imitations of the Viacom Marks,

on or in connection with the advertising, promotion or delivery of services in connection with the

iPad App, or any other use of the Viacom Marks not expressly authorized in the Agreements.

D. Awarding Viacom:

    (i)    TWC's profits and Viacom's damages and/or statutory damages, attorneys' fees and costs, to the full extent provided for by the U.S. Copyright Act, 17 U.S.C. §§ 504 and 505;

    (ii)    statutory damages of $2,000,000 per counterfeit mark in accordance with the Lanham Act, 15 U.S.C. § 1117, or alternatively, ordering TWC to account to and pay to Viacom all profits realized by its wrongful acts, and also awarding Viacom its actual damages, and directing that such profits or actual damages be trebled in accordance with the Lanham Act, 15 U.S.C. § 1117;

    (iii)    actual and punitive damages to which it is entitled under applicable federal or state law;

    (iv)    costs, attorneys' fees, investigatory fees and expenses to the full extent provided by the U.S. Copyright Act, 17 U.S.C. §§ 504 and 505; and the Lanham Act, 15 U.S.C. § 1117; and

    (v)    pre- and post-judgment interest on any monetary award made part of the judgment against TWC.

E. Awarding Viacom such additional and further relief as may be available under applicable federal, state or common law or that the Court otherwise deems just under the circumstances.

Dated: New York, New York
     April 7, 2011

ARNOLD & PORTER LLP

By: _____
    Peter L. Zimroth
    peter.zimroth@aporter.com
    Michael D. Schissel
    michael.schissel@aporter.com
    Lucy S. McMillan
    lucy.mcmillan@aporter.com
    399 Park Avenue
    New York, New York 10022
    Tel: (212) 715-1000
    Fax: (212) 715-1390

    Robert A. Garrett
    555 Twelfth Street N.W.
    Washington, DC 20004
    Tel: (202) 942-5444
    Fax: (202) 942-5999

    *Attorneys for Plaintiffs*