## PUBLIC RECORD VERSION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VIACOM INTERNATIONAL INC., MTV
NETWORKS, a division of Viacom
International Inc. COMEDY PARTNERS, BET
HOLDINGS LLC and COUNTRY MUSIC
TELEVISION, INC.,

                    Plaintiffs-Counterclaim
                    Defendants,

          v.

TIME WARNER CABLE INC., TIME
WARNER ENTERTAINMENT COMPANY
L.P., and TIME WARNER CABLE LLC,

                    Defendants-Counterclaim
                    Plaintiffs.

Civil Action No. 11 CIV 2387 (LBS)

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS-COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS THE CMT COUNTERCLAIM FOR LACK OF SUBJECT MATTER JURISDICTION

Peter L. Zimroth
Michael D. Schissel
Lucy S. McMillan
ARNOLD & PORTER LLP
399 Park Avenue
New York, New York 10022
Telephone: 212.715.1000
Facsimile: 212.715.1399
Peter.Zimroth@aporter.com
Michael.Schissel@aporter.com
Lucy.McMillan@aporter.com

*Attorneys for Plaintiffs-Counterclaim
Defendants Viacom International Inc., MTV
Networks, Comedy Partners, BET Holdings
LLC, and Country Music Television, Inc.*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 3

    Background ..................................................................................................................... 3

    The iPad Dispute ........................................................................................................... 4

    The CMT Dispute .......................................................................................................... 7

ARGUMENT ..................................................................................................................... 10

    THE CMT COUNTERCLAIM SHOULD BE DISMISSED BECAUSE IT DOES
    NOT SHARE A COMMON NUCLEUS OF OPERATIVE FACT WITH THE
    IPAD DISPUTE ............................................................................................................ 10

CONCLUSION ................................................................................................................... 15

# TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE(S)**

*Achtman v. Kirby, McInerney & Squire, LLP,*
   464 F.3d 328 (2d Cir. 2006)..................................................................................................2, 10

*Angel Music, Inc. v. ABC Sports, Inc.,*
   609 F. Supp. 764 (S.D.N.Y. 1985) ...............................................................................................11

*Bray v. City of New York,*
   356 F. Supp. 2d 277 (2004) .........................................................................................................11

*Bu ex rel. Bu v. Benenson,*
   181 F. Supp. 2d 247 (2001) .........................................................................................................11

*Burgess v. Omar,*
   345 F. Supp. 2d 369 (S.D.N.Y. 2004)......................................................................................13, 14

*Goldman Marcus, Inc. v. Goldman,*
   No. 99 CIV.11130KMW, 2000 WL 297169 (S.D.N.Y. Mar. 21, 2000) .........10, 11, 12, 13, 14

*Harry Winston, Inc. v. Kerr,*
   72 F. Supp. 2d 263 (S.D.N.Y. 1999)..............................................................................................14

*Kamens v. Chase Manhattan Mortg. and Realty Trust,*
   443 F. Supp. 130 (1977) ..............................................................................................................12

*Laughlin v. Kmart Corp.,*
   50 F.3d 871 (10th Cir. 1995) .......................................................................................................15

*Lydonville Sav. Bank & Trust Co. v. Lussier,*
   211 F.3d 697 (2d Cir. 2000).........................................................................................................10

*Rivera v. Incorporated Village of Farmingdale,*
   No. 06 CV 2613(DRH)(ARL), 2011 WL 1260195 (E.D.N.Y. Mar. 30, 2011)........................10

*Yetnikoff v. Mascardo,*
   No. 06 Civ.13494 GEL, 2007 WL 690135 (S.D.N.Y. Mar. 6, 2007).........................................14

**STATUTES**

28 U.S.C. § 1367(a) ...........................................................................................................2, 10

Section 602(7), Communications Act of 1934 .............................................................................5

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(b)(1)............................................................................................................1

Plaintiffs-Counterclaim Defendants Viacom International Inc., MTV Networks (now known as Viacom Media Networks), a division of Viacom International Inc., Comedy Partners, BET Holdings LLC, and Country Music Television, Inc. (collectively, "Viacom"), respectfully submit this memorandum of law in support of their motion under Fed. R. Civ. P. 12(b)(1) to dismiss Count Five ("CMT Counterclaim") in the Amended Answer and Counterclaims of Time Warner Cable Inc., Time Warner Entertainment Company L.P, and Time Warner Cable LLC (collectively, "TWC") for lack of subject matter jurisdiction.

## PRELIMINARY STATEMENT

Viacom brings this motion to dismiss the counterclaim TWC recently filed because this Court is without subject matter jurisdiction to hear that claim. TWC seeks to litigate that counterclaim in this Court under the guise of supplemental jurisdiction, even though the operative facts underlying the counterclaim are completely separate and apart from the facts underlying the claims Viacom asserted in commencing this action.

On April 7, 2011, Viacom filed its Complaint alleging that TWC's distribution of live Viacom programming via broadband to Apple, Inc.'s iPad tablets violates the federal copyright and trademark laws and the grant of rights provisions in several agreements the parties entered into beginning in about 2000. On June 6, 2011, TWC responded to Viacom's Complaint by filing an Answer and asserting two declaratory judgment counterclaims: one to declare that TWC has not infringed Viacom's copyrights, asserting the parties' agreements as a defense, and the other to declare that TWC has the right to distribute Viacom programming through the iPad. TWC did not assert claims arising out of any other disputes between the parties, of which there were several (including the one which TWC is currently attempting to import into this case).

Accordingly, this action concerned only whether TWC's iPad distribution violated Viacom's federally registered copyrights and trademarks, as well as the parties' agreements (the "iPad Dispute").

In addition to the iPad Dispute, a completely separate dispute had developed between Viacom and TWC, and on May 24, 2011, Viacom filed an action against TWC in the state court of Texas, Dallas County (the "Texas Action"). The Texas Action concerns TWC's claim that the mix of programming Viacom currently distributes on its Country Music Television channel ("CMT") violates the terms of the "content clause" in a 2004 contract between Viacom and TWC (the "CMT Dispute"). There is no federal jurisdiction with regard to the CMT Dispute; it arises out of facts wholly separate from the iPad Dispute.

Nevertheless, on October 3, 2011, TWC amended its Counterclaims in this action to add a claim (Count V) for breach of the CMT Agreement on the grounds that CMT has violated the content clause of the 2004 agreement (the "CMT Counterclaim"); that is, attempting to insert into the case before this Court the very dispute at issue in the Texas Action. TWC alleges that this Court has supplemental jurisdiction over the CMT Counterclaim pursuant to 28 U.S.C. § 1367(a) because, according to TWC, the CMT Counterclaim is "related to, and form[s] part of, the same case and controversy" as whether Viacom has granted TWC iPad distribution rights.

As we demonstrate below, however, the iPad Dispute and the CMT Dispute are not part of the same case or controversy because they do not "'derive from a common nucleus of operative fact.'" *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 335 (2d Cir. 2006) (citation omitted). Litigation of the iPad Dispute implicates the federal copyright and trademark laws, and concerns at least four agreements between TWC and various Viacom entities entered into beginning in 1995, as well as several amendments to those agreements, the interpretation of

2

the grant of rights provisions in those contracts, the parties' course of dealing with regard to the grant of rights, and highly technical evidence regarding the transmission of Viacom programming via broadband to the iPad. In contrast, the CMT Dispute concerns a single provision—the content clause—in just one amendment to one contract between Viacom and TWC (the 2004 CMT amendment), whether CMT programming substantially deviated from that provision, the evolving tastes of CMT's audience, and the parties' course of dealing with regard to TWC's acceptance of CMT programming over a seven-year period.

Without a common nucleus of operative fact, supplemental jurisdiction cannot exist, and the CMT Counterclaim should be dismissed. TWC should not be permitted simply to tack on to a federal court action a completely separate and unrelated garden variety contract dispute when there is no independent basis for this Court's subject matter jurisdiction. The federal courts were not intended to provide a forum for every contract dispute that might arise between corporate entities such as Viacom and TWC who have a long and very complex contractual relationship.

## STATEMENT OF FACTS

### Background

Viacom is one of the world's leading creators of entertainment programming and content, with programming that reaches over 578 million households worldwide. *See* Viacom Complaint, ¶¶ 25-26.[1] Viacom is the legal or beneficial owner of copyrights and trademarks that cover its programming. *Id.* at ¶¶ 60-69. Viacom's copyrights are registered under the federal Copyright Act and its trademarks are registered with the United States Patent and Trademark Office. *Id.* at ¶¶ 62, 67. TWC is the second largest cable television operator in the United States, with

---

[1] A copy of the Viacom Complaint is attached to the accompanying declaration of Michael D. Schissel, Esq.

3

approximately 14.5 million subscribers to one or more of its video, high-speed data, and voice services. *See* Amended Counterclaims, ¶ 33.

Viacom and TWC have a long-standing relationship whereby Viacom licenses its programming to TWC for distribution to its cable subscribers in exchange for monthly licensing fees. *See* Viacom Complaint, ¶ 38. This relationship is documented in a series of written contracts entered into by the parties. These contracts are very complex and cover multiple aspects of the parties' relationship, including calculation of fees, advertising, programming content, copyrights, trademarks, termination, most favored nations, and many technical terms regarding signal quality, signal encryption and interactive content capabilities, among others. In a commercial relationship this complex, disputes often arise over the rights and obligations of the parties under the many provisions of their multiple agreements.

At issue here are disputes between Viacom and TWC arising out of very different operative facts and very different contract provisions.

**The iPad Dispute**

Viacom commenced this action against TWC alleging that TWC's distribution of Viacom programming through the iPad infringed upon Viacom's federally registered copyrights and trademarks and breached the parties' agreements. *See id.* ¶ 3. The contracts at issue in this litigation consist primarily of the August 10, 2000 Affiliation Agreement (the "Core Services Agreement"), the Comedy Central Agreement, the BET Agreement, the CMT Agreement, and various amendments to those agreements. *Id.* ¶¶ 40-53.

A key issue will be the scope of the distribution rights Viacom granted to TWC. In the Core Services Agreement, the grant of rights reads as follows:

4

*See id.* ¶ 40 (quoting from Core Services Agreement, Section 2(a)) (emphasis added). "Time

Warner Cable Systems" is defined in the Core Services Agreement as:

*See id.* (quoting from Core Services Agreement, Section 1(a)) (emphasis added). Viacom claims

that TWC's distribution to iPads does not constitute providing cable television program services

to consumers via cable. *See id.* ¶ 44. TWC disagrees. *See* Amended Answer ¶ 44. Resolution

of that issue inevitably will involve an analysis of the technology underlying broadband

distribution to iPads. This is clear from the pleadings filed to date. For example, Viacom has

alleged in the Complaint that TWC is:

> convert[ing] the signal it receives from content providers, such as Viacom, into a
> different format at lower bitrates (i.e., lower transmission speeds) and at reduced quality.
> As a result, viewers who have downloaded the iPad App. . . receive two separate signals
> into their homes. One signal — the cable television signal — is formatted for traditional
> cable television and is sent to the set-top box. The other signal the broadband signal —
> is formatted using internet protocol and is sent to the cable modem for transmission via
> wireless router to the iPad.

Viacom Complaint, ¶ 72. TWC denies that allegation, and alleges that its transmission to the

iPad is achieved in the following way:

> TWC provides video programming to its subscribers predominantly in the following
> manner: network programmers deliver digital feeds via satellite to an Integrated
> Receiver/Decoded (IRD) located at a TWC facility. TWC usually receives this satellite
> feed either in MPEG-2 or MPEG-4 format. The feed is then transmitted to an encoder
> via Serial Digital Interface (SDI), Asynchronous Serial Interface (ASI) or Ethernet. A
> video re-encode process is employed to convert all signals to an MPEG-2 format and
> optimize it for distribution to the set-top box. The feed is then wrapped into an MPEG-2
> transport stream, and transmitted to the TWC distribution hubs in IP format. It is then
> transmitted to the TWC's subscribers across TWC-controlled cable systems and is
> ultimately delivered into the TWC video subscriber's home through a coaxial cable. The

5

distribution of video programming to the subscriber's cable modem for in-home iPad viewing utilizes essentially the same process, except the video is re-encoded into the H.264/MPEG-4 format and transmitted using HTTP Live Streaming (HLS) transport protocol, which is another IP transport format.

Amended Counterclaims, ¶¶ 70-71. The resolution of this dispute will require extensive expert testimony from both sides to analyze the technology, as well as to determine whether such transmission can qualify as a "cable service." Another technology issue in the case concerns Viacom's claim that "the iPad App materially degrades, and/or materially and adversely perceptually interferes with, the principal picture quality or the audio quality of Viacom's entertainment programming . . . ." Viacom Complaint, ¶ 79. Also at issue in the iPad Dispute will be the negotiation and meaning of the grant of rights provisions in: the Core Services Agreement (signed in 2000), the Comedy Central Agreement (signed in 2003), the BET Agreement (signed in 1995 by a different entity that Viacom later acquired), and the CMT Agreement (signed in 1999 by a different entity that Viacom later acquired).

In addition, the parties' course of dealing with regard to multiple amendments to the grant of rights in these contracts will be a subject of the iPad Dispute. Viacom alleges that "whenever TWC sought to expand the scope of its rights to distribute Viacom programming via cable television services under the Agreements, including to accommodate new technology, TWC and Viacom negotiated and entered into a signed written amendment to the Agreements, or a separate agreement." Viacom Complaint, ¶ 54. As a result, amendments granting rights for new technologies, including the "Video-On-Demand Amendment" (signed in 2006), the "Start Over Agreement" (signed in 2005), and the "High Definition Feeds Agreement" (signed in 2009) will be at issue.

6

The inability of Nielsen to measure television viewing audiences, which drive advertising revenue, is an important aspect of the iPad Dispute. Viacom alleges in the Complaint that Nielsen cannot measure iPad viewership and that:

> [t]his is of tremendous significance because Viacom relies on the Nielsen ratings to sell its advertising time on its networks, and the greater the audience size, the greater the market value of the advertising time. Any future unauthorized broadband distribution of Viacom programming via the iPad App could potentially result in a significant reduction of the trackable viewership of Viacom's entertainment programming, thereby harming Viacom's advertising-supported business model in ways which will be difficult to measure.

Viacom Complaint, ¶ 81. TWC admits that Nielsen does not track iPad audiences but disclaims knowledge of the importance of Nielsen ratings to Viacom. Amended Answer, ¶ 81. As a result, the role of Nielsen ratings in the television industry's business model is another important issue in this dispute.

Finally, a key disagreement in the iPad dispute involves what the iPad *is*. TWC contends that the iPad itself is just another television, the culmination of an evolutionary line that extends "from analog vacuum tube devices to flat screens—both plasma and LCDs—and now Smart TV's and tablets, such as iPads." Amended Counterclaims, ¶ 6. Viacom disagrees. That issue too is likely to be the subject of extensive expert testimony.

**The CMT Dispute**

The CMT Dispute is entirely different from the iPad Dispute and arises out of a wholly separate set of facts. A review of the CMT Counterclaim in this case and Viacom's Petition in the Texas Action makes this perfectly clear.[2] The CMT Dispute does not implicate the federal copyright and trademark laws (or any other federal statute) and concerns only a 2004 amendment

---

2    Copies of TWC's Amended Answer and Counterclaims and Viacom's Petition filed in the Texas Action are attached to the accompanying declaration of Michael D. Schissel, Esq.

7

to the content clause (the "2004 Content Clause") in a single agreement between Viacom and TWC. *See* TWC Amended Counterclaims, ¶¶ 119-141. The 2004 Content Clause provides:



Amended Counterclaims, ¶ 122 (emphasis added); Texas Petition, ¶ 20. TWC admits that the 2004 Content Clause meant Viacom "retained discretion to control CMT's schedule on a day-to-day basis," but contends that Viacom "explicitly agreed that they would not 'materially deviate' from the 2004 Programming Grid during the term of the agreement." Amended Counterclaims, ¶ 21.

TWC contends that its "detailed comparison of the 2004 Programming Grid versus CMT's current programming demonstrates that the network has indeed undergone a dramatic makeover." *Id.* at ¶ 131. TWC further alleges that its comparison of CMT's current programming grids "demonstrates that the country music-related programming that had been aired on CMT in the 2004 period has been replaced *almost entirely* by movies and television series, which for the most part bear no relationship to country music." *Id.* ¶ 134 (italics in original).

In the Texas Action, Viacom contends that it has not breached the 2004 Content Clause, and that "country music fans (like other music fans) began wanting a greater variety of programming from their music channels" including "non-music television programming" with the "same types of values and stories" as country music. Texas Petition, ¶ 19. To respond to the needs of its audience, Viacom diversified CMT programming content and amended the Content

Clause in 2004 to provide ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* ¶ 20. The

Texas Petition further alleges that "it is customary and expected in the industry for programming

content to develop and evolve over time to accommodate changes in consumer preferences and

the availability of new programming." *Id.* ¶ 20. Viacom also alleges that the "overall

programming approach and brand filtering has remained consistent" from 2004 to the present.

*Id.* ¶ 23. As Viacom alleges in the Texas Action, it is not surprising that TWC accepted the

CMT content without complaint, and in fact negotiated several amendments to the contract

without seeking to amend the 2004 Content Clause. *Id.* ¶¶ 23-27. TWC asserted claims with

regard to the CMT Content Clause only *after* Viacom asserted its rights with regard to TWC's

iPad distribution, apparently seeking leverage in that dispute. *Id.* ¶ 34.

Accordingly, the issues for litigation in the CMT Dispute center on the meaning of the

2004 Content Clause, the parties' course of dealing over the past seven years in which TWC

accepted CMT's mix of programming without complaint, whether CMT's mix of programming

is consistent with the Programming Grids attached to the 2004 amendment, and industry custom

and practice with regard to programmers revising their offerings to accommodate the changing

desires of their audience.

Importantly, the CMT Dispute does not concern the contractual provisions at issue in the

iPad Dispute (or even most of the contracts at issue there), the technology utilized to transmit

Viacom programming to iPads, the inability of Nielsen to measure iPad audiences, the parties'

course of conduct with regard to the scope of Viacom's grant of distribution rights, whether

distribution to iPads constitutes transmission to a "cable system," and whether the iPad is even a

television.

9

## ARGUMENT

## THE CMT COUNTERCLAIM SHOULD BE DISMISSED BECAUSE IT DOES NOT SHARE A COMMON NUCLEUS OF OPERATIVE FACT WITH THE IPAD DISPUTE

"It is axiomatic that federal courts are courts of limited jurisdiction." *Lydonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 700 (2d Cir. 2000). "Counterclaimants bear the burden of establishing the Court's jurisdiction over the subject matter of their claims." *Goldman Marcus, Inc. v. Goldman*, No. 99 CIV.11130KMW, 2000 WL 297169, at *3 (S.D.N.Y. Mar. 21, 2000). Where a counterclaimant maintains that the court has supplemental jurisdiction over its state claim, the court must consider whether the claim is "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a).

Claims and counterclaims form "part of the 'same case or controversy' within section 1367 when they 'derive from a common nucleus of operative fact.'" *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 335 (2d Cir. 2006) (citation omitted). In determining whether a common nucleus of operative fact exists, courts must ask whether "the facts underlying the federal and state claims *substantially overlap*[ ]" or whether "the federal claim *necessarily* br[ings] the facts underlying the state claim before the court." *Id.* (quoting *Lydonville*, 211 F.3d at 704) (emphasis added). Supplemental jurisdiction, however, does not exist "when the federal and state claims rest[ ] on essentially unrelated facts." *Rivera v. Incorporated Village of Farmingdale*, No. 06 CV2613(DRH)(ARL), 2011 WL 1260195, at *9 (E.D.N.Y. Mar. 30, 2011) (quoting *Lydonville*, 211 F.3d at 704).

As set forth above, the iPad Dispute and the CMT Dispute involve different contractual provisions, different rights, different underlying facts, different industry customs and practices

10

and different courses of dealing between the parties. For that reason the two disputes do not share a common nucleus of operative facts. *See Bu ex rel. Bu v. Benenson*, 181 F. Supp. 2d 247, 254 (2001) (finding no supplemental jurisdiction where the federal and state claims involved "different rights, different interests, and different underlying facts"). Courts have "frequently declined to assume jurisdiction where the claims are based on different factual and legal elements." *Angel Music, Inc. v. ABC Sports, Inc.*, 609 F. Supp. 764, 768 (S.D.N.Y. 1985). "Even where the claims are clearly related and derive from the same events courts have held that the claims are not sufficiently one constitutional case if they are related sequentially or if the claims are based on different legal theories." *Id. See also Bray v. City of New York*, 356 F. Supp. 2d 277, 283 (2004) (holding that in a dispute between bicyclists and the City over the legality of mass bicycle rides, supplemental jurisdiction could not be based on the mere fact that the defendant's counterclaim also related to a particular event and plaintiffs' status as mass bike riders when the counterclaim focused on an entirely different issue).

*Goldman Marcus, Inc. v. Goldman* is instructive. In *Goldman*, two business partners, Ian Goldman and Robert Marcus, formed a joint venture called GMI. Goldman was in charge of the development and support of GMI software, while Marcus was responsible for the day-to-day business operations. *Id.* at *1. Three years after they founded GMI, Goldman resigned as an employee and officer, and several other GMI employees left with him to form a new company. *Id.*

GMI then sued Goldman and others in federal court for copyright infringement and misappropriation of trade secrets. The defendants' counterclaims included state law claims for mismanagement and fraud, which GMI moved to dismiss for lack of subject matter jurisdiction. The Court agreed that the state law counterclaims shared a "common origin in Goldman's and

11

Marcus' failure to cooperate in the operation of GMI," but nevertheless dismissed those claims. *Id.* at \*4. In doing so, the court explained that there was "no . . . overlap" among dispositive facts. *Id.* The court further noted that, "[a]side from basic background concerning the parties, the only apparent basis for overlapping proof of the copyright claim and the mismanagement and fraud claims" is merely "proof of the existence of a dispute between Goldman and Marcus over the future of GMI." *Id.* at \*5.

The court in *Goldman* went on to say that while "[e]vidence of their disagreements might well be relevant to establish . . . [each party's motive]," this "overlapping evidence . . . simply reflects the fact that the two alleged courses of action purportedly grew out of the same root cause: the stalemate in GMI's management." *Id.* This back story fails as a common jurisdictional thread because "there is no single event or transaction underlying both the copyright claim and the mismanagement and fraud counterclaims." *Id.* at \*6. Instead, the claims "simply share a common genesis in the dispute over GMI's future," important purely for the purposes of "understanding how the parties came to occupy their current adversarial positions." *Id.* They form "a common nucleus of *explanatory* facts," not of operative ones. *Id.* at \*5. *See also Kamens v. Chase Manhattan Mortg. and Realty Trust*, 443 F. Supp. 130, 133 (1977) (declining to grant supplemental jurisdiction to breach of fiduciary claims in a case alleging federal securities claims when the only facts tied to both claims were explanatory background facts).

Here, no operative facts link the iPad Dispute to the CMT Dispute. The iPad Dispute arises out of TWC's decision to distribute Viacom's programming to iPads in violation of the rights Viacom granted to TWC and in violation of the federal copyright and trademark laws. The CMT Counterclaim contends that Viacom's mix of programming on the CMT channel

12

violated one of the agreements between some (though not all) of the parties in the iPad case. The facts underlying these two claims are entirely separate. No single event or transaction unites them.

In fact, the differences between the two disputes here is far more compelling than those in *Goldman*. Here, the iPad Dispute and the CMT Dispute fail to share even the common genesis that existed among the parties in *Goldman* because they do not stem from the "same root cause." *Id.* at *5. TWC cannot possibly contend that CMT's purported failure to abide by the 2004 Content Clause is somehow linked to TWC's decision to distribute Viacom programming to iPads.

Another case from this Court, *Burgess v. Omar*, 345 F. Supp. 2d 369 (S.D.N.Y. 2004), is also instructive. In *Burgess,* the plaintiff Burgess asserted several federal securities claims as well as state law claims arising out of Burgess's transfer of a company to defendant Omar. Defendant Omar and certain corporate defendants asserted state law claims to recover on a loan and for breach of fiduciary duty, misappropriation and waste. Even though some of the most pertinent counterclaims "involve[d] plaintiff's role in the transferred business" and shared the same time period "relevant to the complaint," the Court dismissed them, concluding that "the *focus of these counterclaims is entirely different.*" *Id.* at 372 (emphasis added). The Court noted that while the complaint focused on a discrete issue—the sale of the plaintiff's business during a specific time period—defendants' counterclaims were at heart about something entirely different: the "alleged looting of the corporate defendants by the plaintiffs over a five to six year period." *Id.* Accordingly, "while there may be some facts that are common to both the complaint and these counterclaims, the complaint and these counterclaims do not arise out of a

13

common nucleus of operative fact." *Id.* "Put another way, while facts relevant to one claim might provide background with respect to the other, *more is required." Id.* (emphasis added).

Finally, mere overlap between some of the parties is insufficient to confer supplemental jurisdiction. If it were, then every lawsuit could invite any imaginable claim. *See Harry Winston, Inc. v. Kerr,* 72 F. Supp. 2d 263, 266 (S.D.N.Y. 1999) ("At a sufficiently general level, everything is logically related to everything else. Any claim asserted by one party against another is logically related to claims asserted against it by its adversary, if only by virtue of the fact that both arise out of the relationship between the parties and both parties chose to assert their respective claims in the same proceeding."); *Yetnikoff v. Mascardo,* No. 06 Civ.13494 GEL, 2007 WL 690135, at \*2 (S.D.N.Y. Mar. 6, 2007) (holding that no common nucleus of operative fact existed because the state claims, which alleged landlord-tenant law violations by the landlord, were irrelevant to the claims under the Fair Debt Collection Practices Act, which "revolve around the . . . [defendant's] actions as debt collector, not landlord").

As the *Goldman* Court explained, to entertain unrelated state claims would cause "federal jurisdiction . . . [to] be expanded to the point that parties alleging a series of wrongs in an ongoing dispute could litigate them all in federal court so long as one in a string of tit-for-tat measures raised a federal claim." *Id.* at \*6. No doubt "some amount of piecemeal litigation will inevitably occur." *Id.* at \*7. But such a result is merely "a consequence of the bedrock principle that federal courts are courts of limited jurisdiction." *Id.*

Allowing TWC to bring in the factually unrelated CMT Counterclaim would result in the very expansion of federal jurisdiction that *Goldman* warned against and that federalism bars. TWC may well prefer to see its separate counterclaim litigated together with Viacom's complaint; however, "subject matter jurisdiction is not a matter of equity or of conscience or of

14

efficiency, but "a matter of the lack of judicial power to decide a controversy." *Id.* (citing

*Laughlin v. Kmart Corp.*, 50 F.3d 871, 874 (10th Cir. 1995)).

## CONCLUSION

For the foregoing reasons, Viacom respectfully submits that the CMT Counterclaim

should be dismissed with prejudice.

Dated:     November 2, 2011
           New York, New York

ARNOLD & PORTER LLP

By: _____

    Peter L. Zimroth
    Michael D. Schissel
    Lucy S. McMillan
    ARNOLD & PORTER LLP
    399 Park Avenue
    New York, New York  10022
    Telephone:  212.715.1000
    Facsimile:  212.715.1399
    Peter.Zimroth@aporter.com
    Michael.Schissel@aporter.com
    Lucy.McMillan@aporter.com

15